Case 2:03-cv-00607-PMP-PAL Document 22-2 2418599 Filed 04/05/04 Page 1 of 90

RECEIVED
ENTERED
SERVED ON
COUNSEL/PARTIES OF RECORD

APR - 5 2004

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

7186 SAN SALVADOR DRIVE
BOCA RATON. FL 33433
561 305 8047

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

-------------------------------X

YAAKOV M. VANN,

Plaintiff

-against-

STATE OF NEVADA,
HONORABLE DOUGLAS SMITH,
CLARK COUNTY, NEVADA
SARGENT KOSMIDES
PETER DUBOWSKY
LAS VEGAS METROPOLITAN POLICE DEPARTMENT
MISTER LORNE WYNE AKA "RABBI YITZ WYNE"
MISS. MICHELLE HALABE,

Defendants

-------------------------------X

ORAL ARGUMENT REQUESTED
BY TELEPHONE

PLAINTIFF'S ANSWER TO COUNTY
DEFENDANTS' MOTION TO DISMISS

CROSS MOTION FOR SUMMARY
JUDGMENT

MOTION TO COMPEL DISCOVERY

CASE No. CV-S-03-0597
PMP (PAL)

## NOTICE OF CROSS MOTION FOR SUMMARY JUDGMENT

COME NOW, Plaintiff Pro Se opposes the Clark County Defendants' *Motion to Dismiss* and

*Opposition to Motion for Preliminary Injunction* and Plaintiff cross moves for Summary

Judgment, pursuant to FRCP Rule 56, against the Honorable J. Smith and Clark County, Nevada.

### MEMORANDUM OF POINTS AND AUTHORITIES

#### PRELIMINARY FACTS

Most of the facts in this case, are not and simply can not be in dispute, as the transcripts

speak for themselves. Thus it is simply beyond dispute that Plaintiff was a member of the Young

Israel Aish HaTorah temple (hereinafter "YIAH") at 9590 West Sahara Ave. in Las Vegas,

Nevada. Plaintiff was in fact a valued member, respected by virtually every member at the

Young Israel Aish HaTorah. Rabbi Wyne (hereinafter "Wyne") postmarked the letter requesting

Plaintiff and his family to renew their membership on August 05, 2002. In September 2002,

Wyne even wanted to honor Plaintiff on Rosh Hashanah, one of the holiest days of the year, and

he stated in a letter: **FILED SEPARATELY** 22, 23
& 24

1

> It is really wonderful to have you and Adina and the kids as part of our community. I appreciate knowing that I have you "on call" for certain responsibilities in the shul.[1]

In fact, it is undisputed that Plaintiff occasionally read the *Torah* for the Congregation, as he has done in many Congregations around the Country, was the *Second Gabbai* (Sexton and the person that stands up on the Bimah, or stage, next to the person that reads the Torah) and performed the *Chevra Kadisha* functions (preparing a dead body for burial) which takes precedence over all other positive commandments. Plaintiff also supplied kosher food to the temple as well as to individual members of the temple through his business, Kosher for Less. It is further undisputed that Plaintiff walked approximately two miles from his house in New York to the Etz Chaim Congregation that Ms. Zetoony (Wyne's mother-in-law) was instrumental in founding, to read the *Torah* when they did not have anyone in their own Congregation capable of reading the *Torah*.

It started becoming clear that Wyne in fact was not an Ordained Rabbi with *Yora Yora Rabbinical Certification* as he had alleged. He further had been fired from the Synagogue in Las Vegas, Congregation Shaarei Tefilla, located at 1331 S. Maryland Parkway. He thus formed the Young Israel Aish HaTorah, with the goal of avenging his being fired, and dividing the Orthodox Jewish Community. Plaintiff did not wish to support Wyne's fraudulent activities as well as his actions that were outright **evil** and contrary to Jewish Law. Wyne took personal offense at Plaintiff for not choosing his temple for the naming of Plaintiff's daughter, born on April 10, 2003. Plaintiff chose not to have the naming ceremony at YIAH, because Wyne was known in the Community to screw up every marriage he has ever performed, every Pidyon Haben

---

[1] Letter, dated September 01, 2002  (Exhibit A)

2

(redeeming the first born son) and every burial.  Furthermore, for the Jewish year, beginning in

September of 2002, Plaintiff did not commit to pay membership fees, but rather paid for a seat

for the Rosh Hashanah and Yom Kippur Holidays.  Plaintiff knew that the Constitution of the

National Council of the Young Israel prohibits its affiliate congregations from charging for

services throughout the year with the exception of Rosh Hashanah and Yom Kippur.  (YINC

Constitution, Sec. 3.3  b.3, as found on their website, www.youngisrael.org).  Plaintiff thereby

knew, that Plaintiff was able to attend all services for the entire year, without having to pay any

monies other than the $125.00 for a holiday seat.  Plaintiff was in communication with other

members of the YIAH about the possibility of holding prayer services outside of the YIAH.

Such communications are still ongoing, and said plans are very close to fruition.

 Wyne, who has been discharged from his Rabbinical duties, at lest twice, knows he can

not get another head pulpit position in another Orthodox congregation.  He therefore knows how

important his job is to him, and he will therefore do anything, legal or not, to keep said job.

Wyne further knew that he did not have a contract to be the Rabbi at the YIAH, Wyne would be

seeking a lifetime contract from the YIAH and therefore needed to rid YIAH of everyone that did

not approve of his fraudulent and or other unethical practices.  Another Orthodox Jewish

synagogue in a close proximity to his, would virtually ensure that the YIAH would not be able to

pay him his current salary, as even more people (and their accompanying membership dues and

donations) would leave the YIAH.

 Wyne, and his relatives therefore began a campaign to get Plaintiff to move out of Las

Vegas.  This objective and goal was openly admitted on the record as Wyne said that Plaintiff's

father asked Wyne "what do you want?" and Wyne said "He needs to be under the care of a

3

psychiatrist <u>and he needs to move</u>." Emphasis added. (T 12/20/02 P. 10 L. 5)

J. Smith clearly directed Plaintiff to "MOVE." Specifically, J. Smith said "It's [Order of Protection] in effect. YOU ARE TO STAY AWAY, FIVE BLOCKS. IF YOU HAVE TO MOVE, YOU MOVE. It's in effect." Emphasis added. (T 11/08/02 P. 29 L. 15)

Ms. Halabe came to Court on December 20, 2002 to tell the Judge that Plaintiff was in violation of the Court's Order, and specifically, "he has violated my restraining order every day since you had issued it. He is hasn't moved. He's within one [block of the temple]."[2] Lastly, J. Smith even said on the record prior to one of the court dates, that Plaintiff doesn't even have to come to Court if he moves to Florida.[3]

Thus, when plaintiff exercised his Constitutional right to live where he wants to, Defendants Wyne, Dubowsky, Halabe, Smith, and Kosmides CONSPIRED and did ensure that Plaintiff would be deprived of ALL Constitutional Rights (as explained infra) including but not limited to, the right to exercise his religion, have an attorney, have an unbiased decision maker, confront and cross-examine witnesses, be provided with the evidence used against the accused, carry on the profession of one's choice, bear arms, not have to incriminate oneself, the right to

---

[2] T 12/20/02 P. 22 L. 5. The words in bracket are not in the transcript because the Court Reporter is ordered to stop transcribing everyone else, but the judge, when the Judge speaks.

[3] Plaintiff does not have that transcript. Plaintiff is extremely grateful to Mr. Gower's cooperation in both obtaining transcripts and granting extensions of time. Plaintiff certainly believes Mr. Gower to be truthful and believes that he has provided copies of all transcripts that he has. Plaintiff does believe that more transcripts have been transcribed, per J. Smith's order. Specifically, J. Smith responded in the affirmative that copies of all transcripts should be sent to Henderson. (T 05/08/02 P. 9 L. 18). <u>Plaintiff therefore moves this Court to Order that a copy of the entire file (less documents already provided) be provided to Plaintiff, as they are required to opposed the County's Motion to Dismiss, and each transcript provides more Constitutional Violations.</u>

appeal an incorrect ruling, the right to have privileged material not come into court and most

importantly, the right to not be thrown into jail by a Judge that did not even have jurisdiction.

Plaintiff brought an action in this Court for Civil Rights Violations and other Pendent Claims.

## LEGAL ARGUMENT

The Clark County Defendants have brought a *Motion to Dismiss* and an *Opposition to*

*Plaintiff's Request for Preliminary Injunction.* The basis for their motion is Judicial Immunity

and Younger Abstention Doctrine. JUDICIAL IMMUNITY AND YOUNGER ABSTENTION

DOCTRINE DOES NOT APPLY IN THIS CASE

1.    JUDICIAL IMMUNITY IS NOT ABSOLUTE.

The Ninth Circuit, quoting the Supreme Court has said:

The immunity afforded judges and prosecutors is not absolute. A judge lacks
immunity where he acts in the "clear absence of all jurisdiction," *Bradley, 80 U.S.
(13 Wall.) at 351,*or performs an act that is not "judicial" in nature. *Stump v.
Sparkman, 435 U.S. 349, 360, 55 L.Ed. 2d 331, 98 S. Ct. 1099 (1978).*

*Ashelman v. Pope,* 739 F.2d 1072 (9th Cir. 1986). Thus, non-judicial acts and or acts in absence

of all jurisdiction are not protected under judicial immunity. Contrary to Judge Smith's beliefs,

he did not have jurisdiction over the Plaintiff for the following acts:

A.    Issue a Bench Warrant resulting in incarceration, at a time before 9:00 a.m., on April 02,

2004, when Plaintiff was not ordered to be in court prior to 9:00 a.m.

B.    Judge Smith did not have jurisdiction to summarily incarcerate Plaintiff for alleged

contemptuous acts having allegedly been committed on a prior court date.

C.    Judge Smith did not have jurisdiction to sentence Plaintiff to jail without providing

Plaintiff an attorney or without ensuring that Plaintiff intelligently waived said right to an

5

attorney.

D.   Judge Smith did not have jurisdiction on Nov. 22, 2002, December 20, 2002, April 01,

2003, April 02, 2003, April 03, 2003, May 06, 2003, May 08, 2003 and any subsequent

date, without a clear charge in writing against Plaintiff, alleging a violation of the law.

Furthermore, even with a written affidavit, Judge Smith did not have jurisdiction to

decide the case; by opinions of the United States Supreme Court, the case should have

been heard by another judge, and by statute in Nevada, it must have been another judge to

hear the contempt case.

E.   Judge Smith did not have jurisdiction to take away Plaintiff's Driver's License and or

threaten to take away Plaintiff's Drivers License.

F.   Judge Smith did not have jurisdiction to take away Plaintiff's relatives, friends and other

interested Rabbis from exercising their First Amendment Constitutional Rights,

especially when said people have no "presence" or connection to the State of Nevada.

A

Aside from the fact that J. Smith did not even have jurisdiction over Plaintiff on April 02,

2003, due to there being no formal charge against Plaintiff, J. Smith ordered a bench warrant

issued prior to 9:00 a.m., and caused Plaintiff to be incarcerated for alleged contemptuous actions

performed on a date prior to April 02, 2003.  This incarceration was ordered, without notice and

without an opportunity to be heard.

As stated in the papers attached to Plaintiff's Complaint, specifically, *Memorandum of

Law in Support o Plaintiff's Request for an injunction,* fn4, Plaintiff has a parking receipt from

the Golden Nugget, located at First Street, two short blocks from the Court House on Third

6

Street, stamped at 8:48 a.m., on the morning of April 02, 2003 (please see Exhibit B). It simply does not take more than three minutes to walk to the court house from that parking garage. Furthermore, the transcript of April 02, 2003, as well as the docket sheet (minute order) clearly reflect that Defendant (in this case, Plaintiff in the state action) was not present, and Plaintiff's appointed counsel did not answer the ALLEGED calling of the case. **NEITHER** THE PLAINTIFF NOR HIS COURT APPOINTED COUNSEL WAS LATE FOR COURT WHEN JUDGE SMITH DIRECTED THE ARREST AND INCARCERATION OF PLAINTIFF.

The *TEMPORARY CUSTODY RECORD* (Exhibit C) lists the time of arrest as 9:05 a.m. Yet the transcript, reflects that after other cases were heard, and Mr. Baker was arguing with the Court how he shouldn't have to represent Plaintiff, he stated on the record, that at the time he was speaking, it wasn't even 9:05. (T 04/02/02 P. 4 L. 10). Thus, Plaintiff was simply not late to court. **No legal basis existed to cause the arrest of the Plaintiff and the motivation of the Court to direct the arrest and incarceration of the Plaintiff is clearly a part of the continued conduct of the Court exercising a vendetta against Plaintiff and collaborating with Wyne and the other Defendants to deprive Plaintiff of his Constitutional rights and privileges, including but not limited to, forcing Plaintiff to move out of Clark County, NV.**

B

The *ORDER FOR SUMMARY PUNISHMENT OF CONTEMPT COMMITTED IN THE IMMEDIATE VIEW AND PRESENCE OF THE COURT* states that "Δ came into ct disrupting a full courtroom late." Yet the transcript reflects that J. Smith said "He's been disruptive in the past. Today he hasn't said anything. He went right into custody."Emphasis added (T 04/02/03 P. 4. L. 13) Thus, clearly Plaintiff was being punished for past alleged disruptive conduct and **the**

7

alleged stated grounds on the Order was a mere pretext and falsification on the part of the Court to unlawfully and unconstitutionally detain the Plaintiff.

The Supreme Court has stated in *In re Oliver,* quoting *Ex parte Terry,* 128 U.S. 289, that the justification for summary punishment is "...that a court's business could not be conducted unless it could suppress disturbances within the courtroom by immediate punishment." *In re Oliver,* 333 U.S. 257, 274. The Court further quotes *Cooke v. United States,* 267 U.S. 517 to state that *Terry* punishment was limited to "flagrant defiance" that if "...not instantly suppressed and punished, demoralization of the court's authority will follow." THUS, IT IS BEYOND DISPUTE, THAT SUMMARY PUNISHMENT IS LIMITED TO FLAGRANT DEFIANCE THAT IS COMMITTED IMMEDIATELY PRECEDING THE PUNISHMENT, AND NOT COMMITTED ON AN ENTIRELY DIFFERENT COURT DATE. Lastly, in *Terry,* the alleged contempt actually disrupted a trial in progress. In the case at bar, J. Smith clearly stated, "he now shows up late when I'm about to start in-custody preliminary hearings." (T 04/02/03 P.2 L.20) Thus, even if Plaintiff committed contemptuous actions, said actions did not disrupt actual court proceedings, and summary punishment was totally unwarranted.

Of course, the maximum 25 day sentence for allegedly being five minutes late, is an Eight Amendment violation. It is further, contrary to the law on punishment for Contempt, to be punished for mere tardiness. The Second Circuit reversed a $350.00 monetary fine for an attorney being 25 minutes late and actually holding up approximately 25 people including a jury. *United States v. Seltzer,* 227 F.3d 36 (2nd Cir. 2000). Any incarceration and certainly 25 days incarceration is a much harsher and crueler punishment, than a $350.00 fine, and being 5 minutes late is a lot less severe than 25 minutes late. The Ninth Circuit has consistently held that bad

8

faith is required whenever courts invoke inherent powers to sanction, regardless of the form of

sanction and "mere tardiness does not demonstrate the improper purpose or intent required for

inherent power sanctions." *Fink v. Gomez* (239 F.3d 989, 992). See also *U.S. v Stoneberger*,

805 F.2d 1391 (9th Cir. 1986), where the Court reversed sanctions on a "chronically late" person.

J. Smith certainly knew that his summary punishment was both unlawful and Unconstitutional,

and yet predetermined before Plaintiff even entered the courtroom that he would be handing

down the maximum penalty to the Plaintiff, even though Plaintiff did nothing wrong. This

predetermination was clearly stated on the record. Specifically, J. Smith said:

> Actually we didn't have to go through this exercise. My opinion, this was
> criminal contempt, which means I didn't have to give you a hearing, I didn't have
> to allow you to bring an attorney in, I didn't have to bring these people in.
> Criminal contempt is different. When there's a Court order and you violate it <u>and
> I accept a statement that you've violated</u> it, I don't have to have a hearing. I don't
> have to have a hearing. **AND THERE AIN'T GOING TO BE ANOTHER
> ONE.** Emphasis added.(T 12/20/02 P. 27 L. 15).

Thus, J. Smith was determined to incarcerate Plaintiff, even though it was contrary to Supreme

Court and Nevada State law. J. Smith therefore intentionally called Plaintiff's case prior to 9:00

a.m. and used Plaintiff's alleged tardiness as a pretext and an excuse to incarcerate Plaintiff.

Such actions are without jurisdiction, evidence bad faith and malice per se, and are not protected

by Judicial Immunity.

C

It is undisputed that on December 20, 2002, J. Smith sentenced Plaintiff to 25 days in jail.

(T 12/20/02 P.20 L. 20). It is also undisputed that J. Smith prejudged Plaintiff and was

determined to sentence Plaintiff to jail, as J. Smith said "I can tell you Mr. Vann, your attorney

saved your behind because <u>I was intending probably to put you in jail</u>." (id. P. 25 L. 18). It is

9

further undisputed that J. Smith knew that Plaintiff could not afford an attorney, as Plaintiff had already filed a timely affidavit with an *APPLICATION TO PROCEED IN FORMA PAUPERIS RELATING TO TPO*, attached to the Plaintiff's COMPLAINT in this action.

It is simply black letter Constitutional Law, that a Court can not sentence a person to jail (even a suspended sentence) without an attorney, and the government must appoint an attorney for one that can not afford an attorney. *Argersinger v. Hamlin*, 407 U.S. 25 (1972), *Scott v. Illinois*, 440 U.S. 367, 373-374 (1979), and *Alabama v. Shelton*. 535 U.S. 654 (2002). IT IS FURTHER CONSTITUTIONAL LAW THAT A COURT DOES NOT HAVE JURISDICTION OVER SUCH A CASE WITHOUT APPOINTING COUNSEL, *Johnson v. Zerbst*, 304 U.S. 458, 58 Sct 1019, in which the Supreme Court said <u>"if this requirement of the Sixth Amendment is not complied with, **the court no longer has jurisdiction to proceed."**</u> *Johnson* at 468.  <u>THUS IT IS ABSOLUTELY CLEAR THAT J. SMITH ACTED WITHOUT ANY JURISDICTION, AND THEREFORE IS NOT PROTECTED BY JUDICIAL IMMUNITY.</u>

## D

As stated supra, all the state proceedings were clearly driven with the intent to force Plaintiff to move from his residence in Las Vegas. Thus, a campaign began to harass Plaintiff with court proceedings. WHILE J. SMITH'S ORDERS WERE TOTALLY UNCONSTITUTIONAL, PLAINTIFF NONETHELESS FULLY COMPLIED. Thus, on January 21, 2003, per the *Minute Order*, the case was taken off calender, as there were no violations. Plaintiff went to Congregation Shaarei Tefilla, the Congregation that fired Lorne Wyne, as stated supra, and Plaintiff had absolutely no contact with Wyne & Halabe.

As stated above, Plaintiff has read the Torah and performed the religious services in many

10

Congregations around the country. Rabbi Wasser, the Rabbi of Congregation Shaarei Tefilla (and a former member of YIAH), asked Plaintiff to read the *Megillas Esther* on the holiday of *Puirim. Purim* happened to have been on March 17th through March 19th in the year 2003. To Wyne, who had done everything in his power to discredit Plaintiff and portray Plaintiff as needing a psychiatrist (T 12/20/03 P. 10 L. 8), it was totally unacceptable that several members of his temple would come to Congregation Shaarei Tefilla, the Congregation that fired Wyne, to hear Plaintiff read the *Megillah.* In fact, several of YIAH members were present at Congregation Shaarei Tefilla, and Plaintiff did in fact do a perfect job reading the *Megillah* for a "packed house" with an excellent party at Congregation Shaarei Tefilla; while the YIAH had no planned program and had much fewer people than Congregation Shaarei Tefilla. This caused Wyne to call his favorite "buy a judge" and allege a violation of his restraining order. <u>Wyne was simply not going to let Plaintiff perform the services in the Congregation that fired him, and thus sought to have Plaintiff jailed again.</u>

Thus, as the *Minute Order* clearly reflects, the case was on calendar for March 28, 2003 (for the Widdis Motion, as discussed infra). Yet the very day after *Purim*, on March 20th, J. Smith ordered a hearing to take place on March 21st. Clearly there was no violation of any court order. In Court on March 21st, Mr. Hastings, Plaintiff's "appointed attorney, specifically requested to know "the alleged violation date." (T 03/21/03 P.11 L. 8). J. Smith replied that "it's in the file." It certainly begs the question of what file it was in? Neither Mr. Hastings, nor Plaintiff ever received said file or document containing any alleged violation. <u>Furthermore, no written document even existed to be in any file,</u> as J. Smith freely admitted that no document existed. Specifically, Mr. Lally, Plaintiff's appointed lawyer after J. Smith relieved the Public

11

Defender, asked the Court:

> MR. LALLY: Okay, Judge, Mr. Vann just asked me if there was any sort of a
> complaint or anything indicating what the nature of the charge is or what –
> THE COURT: Violating <u>my</u> protective order.
> MR. LALLY: Okay, Is there anything in writing, your Honor?
> THE COURT: Nope. Violating <u>my</u> order. There will be testimony taken, not on
> the 14[th]. They will set the hearing on the 14[th]. Emphasis added

(T 03/08/03 P. 8 L. 20). THUS, THERE NEVER WAS ANY WRITTEN AFFIDAVIT WITH A

CHARGE AGAINST PLAINTIFF, AND OBVIOUSLY THERE COULDN'T BE A WRITTEN

CHARGE AGAINST PLAINTIFF, AS THERE IS NO CRIME IN THE UNITED STATES OF

AMERICA FOR BEING A PROMINENT AND RESPECTED CITIZEN AS WELL AS A

RESPECTED CONGREGANT. The Court and J. Smith simply did not have jurisdiction

without said affidavit. *NRS 22.030, Ex Parte Hedden,* 29 Nev. 352, 90 Pac. 737 (1907) and *Ex*

*Parte Tani,* 29 Nev. 385, 399, 91 Pac. 137 (1907). THUS NO COURT HAD JURISDICTION

OVER PLAINTIFF WITHOUT AN AFFIDAVIT AND JUDGE SMITH DIDN'T HAVE

JURISDICTION OVER PLAINTIFF EVEN WITH AN AFFIDAVIT, AS A DIFFERENT

JUDGE WAS REQUIRED TO PRESIDE OVER ANY ALLEGED CONTEMPT CHARGE.

JUDGE SMITH THEREFORE ACTED ABSENT ANY JURISDICTION OVER PLAINTIFF,

AND JUDICIAL IMMUNITY DOES NOT APPLY TO JUDGE SMITH. <u>J. Smith was well</u>

<u>aware that he didn't have jurisdiction over an alleged violation of his own order, as he indicated</u>

<u>to Mr. Siegel</u>:

> Well, you represent him just for the issue of whether he violated Judge
> Abbatangelo's. You see, under the law, Abbatangelo can't hear it. <u>Somebody</u>
> <u>else who's separate and apart has to hear it.</u> That's what I'm hearing. Emphasis
> added (T 11/22/02 P.8 L. 7).

Thus, when J. Smith ordered Plaintiff into court 6 times for the purpose of J. Smith presiding

12

over a hearing as to a Protective Order that he signed and ordered, he knew he was acting with a

complete lack of jurisdiction. That is not the first time J. Smith tried to hear a contempt charge

of his own order, as he said:

> You are to stay away. You're not even to go close. And I am going to call the
> sergeant, and if you're close, I want you arrested without bail. You'll be held
> until I can hear the case. I don't want you near that place during this 30-day
> period.    Emphasis added  (T 11/08/02 P. 27 L. 11)

### E

J. Smith did not have any jurisdiction to take away or threaten to take away Plaintiff's

driver's license on November 08, 2002, when Plaintiff was just in court on the issue of a

Protective Order. J. Smith was clearly just riling Plaintiff and intimidating Plaintiff from

defending himself against baseless charges.(T 11/08/02 P.11 L. 13)  There is no justification for

intimidating the Plaintiff, especially in a complete absence of jurisdiction on the matter. J. Smith

did not have jurisdiction on the matter of Plaintiff's driving privileges, and judicial immunity

does not apply in a complete absence of jurisdiction.

### F

Even were J. Smith to have jurisdiction over Plaintiff, there is no basis in the law to

thereby have jurisdiction over Plaintiff's friends, fellow parishioners, and relatives, including his

father, a duly licensed attorney to practice law for over thirty five years and an extremely learned

man in the Jewish Faith and Jewish Law. Yet that is exactly what J. Smith did, two times on

December 20, 2002.  (T 12/20/02 P.12 L. 10 & P. 21 L. 3)  Even worse than J. Smith trying to

gain jurisdiction over people that have never even step foot in Las Vegas, is that when Rabbis

from all over the world, including the one Wyne claims ordained him, are appalled that one who

calls himself a Rabbi would seek to have a person jailed SOLELY for making a donation and

13

attending a charity event,[4] and they on their own initiative would call Wyne to tell him that he is

way out of line to seek to jail the Plaintiff just for attending a charity event, that J. Smith would

attribute those telephone calls to Plaintiff and seek to jail Plaintiff because of those calls.[5]

JUDGE SMITH THEREFORE ACTED WITH A COMPLETE LACK OF JURISDICTION TO

SENTENCE PLAINTIFF TO JAIL FOR LEGAL ACTS DONE BY OTHERS OUTSIDE THE

STATE OF NEVADA.

2.    THE FACTS OF THIS CASE ARE SO OUTRAGEOUS, EGREGIOUS, AND UNLIKE
      ANY OTHER CASE, THAT THERE IS ABSOLUTELY NO BINDING PRECEDENT
      FOR THIS COURT TO UPHOLD JUDICIAL IMMUNITY.

J. Smith immediately took a dislike of the Plaintiff, affiliated himself with Wyne's course

of action, was clearly biased, prejudged the case, and denied Plaintiff all cross-examination

despite three proper and timely objections, didn't allow Plaintiff to put on a single witness to

rebut the perjury laden unsworn hearsay charges against Plaintiff, regularly had ex-parte

---

[4]The charity dinner referred to was the Chabad of Southern Nevada, Green Valley and Summerlin *Seeds of Growth Banquet,* on November 17, 2002, at the Venetian Hotel. Plaintiff had a full page ad in the dinner journal, under his Kosher for Less business. Plaintiff also supplied all the kosher salmon for the event, as per Venetian Purchase Order # 00118483, and check # 41541. Please see Exhibit D This was stated on the record (T 12/20/02 P. 3 L. 13).

[5] T 12/20/02 P. 13 L. 22 read in conjunction with P. 20 L.22, referring to a possible future list of Rabbis that may call Wyne, J. Smith will sentence Plaintiff to 50 days, inferring that the first 25 days were more about the list of Rabbis calling Wyne, than Plaintiff going to a charity dinner. Plaintiff could certainly affirm to that understanding from being in the courtroom, that the jail sentence was more about the Rabbis calling Wyne than of any alleged violation at the charity dinner, as there was very little testimony about that dinner at all, and all if not most of Wyne's testimony was about great Rabbis calling him. This is further affirmed by the J. Smith's comment on P. 21 L. 8 "But this is way over, way over the top" immediately after talking about "an official investigation." Plaintiff was never given notice and an opportunity to be heard on that alleged violation of other Rabbis independently calling Wyne. Mr. Siegel tried to state that Plaintiff would "say in court he had no contact with these Rabbis." id. at P. 14 L.7. J. Smith, however, continuing from the prior page, where he said four times "he knew" and "he knew what he was doing."

14

communications with Wyne and his cohorts (even ordering Plaintiff out of his courtroom to hold such ex-parte communication)[6], sentenced Plaintiff to jail without affording Plaintiff an appointed attorney, ordered Plaintiff to be present in court on six occasions knowing full well that the court did not have jurisdiction and all the while knowing that J. Smith by statute and case law could not preside over the case, incarcerated Plaintiff knowing there was no basis in the law for said incarceration without first affording due process, and prevented Plaintiff from appealing all these violations of Plaintiff's Constitutional Rights.

A.      J. SMITH WAS CLEARLY BIASED AND PREJUDGED THE CASE

It wasn't even two pages into the unsworn testimony on November 08, 2002, that J. Smith said "I want you to stay at least five blocks from the vicinity." (T 11/08/02 P. 4 L. 2). At the end of the "hearing," J. Smith affirmed his prejudged decision, and as stated above, said "It's in effect. YOU ARE TO STAY AWAY, FIVE BLOCKS. IF YOU HAVE TO MOVE, YOU MOVE. It's in effect." Emphasis added (T 11/08/02 P. 29 L. 15). Thus J. Smith permitted Miss Halabe and Ms. Wyne to rant on and a create a circus out of J. Smith's courtroom for 25 more pages of the transcript, all the while knowing that he prejudged and predetermined the outcome of the case.

B.      J. SMITH TOTALLY DENIED PLAINTIFF HIS CONSTITUTIONAL RIGHT TO
        CROSS-EXAMINE WITNESSES TESTIFYING AGAINST HIM.

J. Smith permitted at least two people to give unsworn, hearsay testimony, not subject to cross examination. Plaintiff objected at least three times to not having the witnesses for Halabe

_____

[6]T 11/19/02 P. 11 L. 13

sworn in and subject to cross examination.[7] J. Smith's response was "unless I am mistaken, this is my courtroom, but I will swear in who I want to swear in" and "this isn't your courtroom, it is my courtroom." (T 11/08/02 P. 18 L. 1 & P. 20 L. 16) Thus Ms. Wyne and other unidentified speakers were never sworn in, Ms. Halabe was sworn in, but J. Smith read her hearsay statement into the record and afforded no cross-examination of her.

The Supreme Court is abundantly clear that cross-examination is required. Specifically, the *Davis* court stated:

> A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony." 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev. 1970). We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. *Greene v. McElroy, 360 U.S. 474, 496 (1959).* n4
> n4 In Greene we stated:
>> "Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case **must be disclosed** to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, **might be perjurers** or persons **motivated by malice, vindictiveness,** intolerance, **prejudice, or jealousy.** We have formalized these protections in the requirements of confrontation and cross-examination. . . ." *360 U.S., at 496.* (Emphasis added)

*Davis v. Alaska,* 415 U.S. 308, 316. See also *Willner V. Committee*, 373 U.S. 96 for non-criminal cases. Clearly, the only "witnesses" were the biased wife, mother-in-law and mistress of

---

[7]Transcript of 11/08/02 page 17, line 19; page 19 line 5; and page 20 line 14

the same man, the one trying to unlawfully obtain a life time contract at the YIAH. Plaintiff was absolutely entitled to confront all the biased witnesses, note the perjured testimony, and clearly have the record reflect the vindictiveness of those three witnesses. Not only did J. Smith not afford Plaintiff any cross examination, but J. Smith didn't even disclose to Plaintiff the evidence the government had and considered against Plaintiff. Specifically, the *Voluntary Statements* that Mr. Gower enclosed in his Motion to Dismiss, had never been disclosed to and or seen by Plaintiff prior to receiving it in Mr. Gower's motion. Even despite a valid request served with the proper fees, METRO did not produce said reports to Petitioner or Mr. Siegel.[8] There is of course good reason J. Smith couldn't disclose said reports to Plaintiff. They all indicate that no crime was committed. Only in J. Smith's court could someone be standing talking to fellow parishioners, and get an Order of Protection issued against that person because Wyne's mother-in-law came to him to yell at him and he didn't say a word back.[9] Only in J. Smith's courtroom can someone who is not even a member of the YIAH temple (Halabe) speak on behalf of the

---

[8]J. Smith and Sgt. Kosmides conspired to prevent Plaintiff from ever seeing said reports. Sgt Kosmides and Metro denied their existence and demanded $350.00 "research fees" to locate any information about the incident reports that were testified about in court.

Earlier, when Plaintiff sought to look in the court file, to review said documents, J. Smith had the following words of wisdom:

> But I also understand that you threatened one of the ladies out front. Be aware of this: If there's another threat, you're going to jail. Do you understand me? Do you understand me real clear? You will go to jail if there's another threat at my clerk out front. (T 11/19/02, P.3 L. 9)

Of course there was never any threats, just a request, Constitutionally protected, to see the evidence the government used against Plaintiff.

[9]*Voluntary Statement* of Adrienne Zetoony, dated October 25, 2002

17

entire congregation to say what the temple's security policy is and who is or is not being "bullied," [10] J. Smith couldn't allow cross-examination of Ms. Halabe, who stated several times how she is fearful of her life, because her own son intentionally broke her arm, while Plaintiff never had any physical contact with her and the record doesn't even reflect a single word ever having been spoken by Plaintiff to Ms. Halabe. J. Smith obviously couldn't allow cross-examination of the unsworn, hearsay testimony of an alleged incident with a "Rabbi from Brooklyn." (T 11/08/02 P. 23). Of course it never occurred, no Rabbi from Brooklyn would have ever testified that any physical confrontation or "blows" ever occurred on Yom Kippur or any other occasion. Only in J. Smith's courtroom is double hearsay allowed in "evidence" instead of having someone come into court and testify under oath. Only in J. Smith's courtroom, is double hearsay acceptable in place of live testimony about something that allegedly happened in front of an "entire congregation." Hopefully Your Honor will be interested to know why out of an entire Congregation that included: Rabbi Shalom Ever with 25 years pulpit experience and current Dean of the Shalom Torah Center, Rabbi Edgar Gross, Rabbi Moshe Peltz, Rabbi Mordichai Azran, retired Sheriff Al Hartenstein, Phillip Kantor, Esq., YIAH board member Jack Coronel, Esq., and Les Levin, Esq, just a few among the many honorable Congregants, why Wyne could only get his biased mother-in-law (Adrienne Zetoony), wife (Helene Wyne) , and mistress (Michelle Halabe) to testify falsely in his favor. It is of great wonder that with so many respectable Congregants, Wyne could only get three biased UNEMPLOYED women to testify falsely. It is no wonder that J. Smith could not allow cross-examination of any of Wyne's biased

---

[10]Voluntary Statement of Michelle Halabe, dated October 25, 2002 and *Affidavit* of Halabe, filed with the Justice Court on October 22, 2002.

18

witnesses. <u>Any cross-examination at all would have shattered J. Smith's prejudged decision.</u>

Lastly, even were it true, which it is not, that Plaintiff beat the ---- out of the "Rabbi from

Brooklyn," it would not constitute a legal basis for Ms. Halabe to get a Protective Order.  The

relevant statutes are abundantly clear.  Any activity must be targeted to the person seeking the

order, and not unrelated third parties.[11]  NRS 200.591, NRS 200.571 and NRS 200.575 with an

emphasis on subsection 6.  J. Smith knew no amount of perjured testimony would ever overcome

even a prima facie case required to issue a Protective Order.  J. Smith knew that his actions were

not lawful and that no Protective Order should have ever been granted against Plaintiff, that said

Protective Orders would harm and actually did harm Plaintiff, and said Protective Orders did

violate Plaintiff's First, Second, Fifth, and Fourteenth Amendment Rights.

C.      JUDGE SMITH KNEW THAT HE COULDN'T HEAR THE ALLEGED CONTEMPT
        VIOLATION AGAINST PLAINTIFF, AS JUDGE SMITH SITTING ON THE CASE
        WOULD VIOLATE PLAINTIFF'S DUE PROCESS RIGHTS

Not only are actual conflicts a violation of Due Process, but even the appearance of a conflict

must be avoided as the Supreme Court has said:

> Concededly, a "fair trial in a fair tribunal is a basic requirement of due process." In
> re Murchison,  349 U.S. 133, 136 (1955). This applies to administrative agencies
> which adjudicate as well as to courts. Gibson  v. Berryhill, 411 U.S. 564, 579
> (1973). **Not only is a biased decisionmaker constitutionally unacceptable but
> "our system of law has always endeavored to prevent even the probability of
> unfairness."** In re Murchison, supra, at 136; cf. Tumey  v. Ohio,  273 U.S. 510,
> 532 (1927). In pursuit of this end, various situations have been identified in which
> experience teaches that the probability of actual bias on the part of the judge or
> decisionmaker is too high to be constitutionally tolerable. Among these cases are
> those in which the adjudicator has a pecuniary interest in the outcome n14 <u>and in
> which he has been the target of personal abuse or criticism from the party before
> him.</u> n15 (footnotes omitted) Emphasis added.

---

[11]With the exception of threatening one person to later hurt another person, but there is no
allegation that Plaintiff threatened Halabe to commit an assault on the Rabbi from Brooklyn.

19

*Withrow v. Larkin,* 421 U.S. 35, 46, 95 S.Ct. 1456.  Aside from the law stated above that J.

Smith couldn't hear the case because he issued the underlying order that was the subject of the

contempt charge, J. Smith could not have heard the case due to him stating on the record that:

> As well, the record should reflect he has accused me of accepting a bribe which is
> offensive in and of itself and he's said some other things that simply were not
> true.
>
> ...
>
> He has accused me of accepting a bribe from this Rabbi which defames me and
> the Rabbi.       (T 03/21/03 P. 5 L. 6 & P. 6 L. 5).

Thus, J. Smith has clearly shown, that no alleged violation took place, <u>J. Smith used his judicial</u>

<u>office as an OFFENSIVE WEAPON to retaliate against Plaintiff</u>, and that jailing Plaintiff was a

premeditated decision that was not the result of Plaintiff committing any wrong.

This Court certainly knows that free speech is not lost just because criticism is targeted at

a judge, as the Supreme Court has stated:

> Citizens have a right under our constitutional system to criticize government
> officials and agencies.  <u>Courts are not, and should not be, immune to such</u>
> <u>criticism.</u>    Emphasis added.

*Konigsberg v. State Bar of California,* 353 U.S. 252, 269, 77 S. Ct. 722, 731.  Furthermore, the

document allegedly written by Plaintiff, if in fact was written by Plaintiff allegedly accusing J.

Smith of being bribed by Yitz Wyne, would be privileged and inadmissable as a confidential

communication between penitent and clergy.  The letter referenced several times on March 21,

2003, and provided to Mr. Hastings in court, is a letter ALLEGEDLY from Plaintiff to Rabbi

David Rue, Av Beis Din (Chief Judge in the Jewish Court) in California.  Such a letter is

absolutely privileged, and therefore inadmissible.

D.    JUDGE SMITH, OVER OBJECTION OF PLAINTIFF, DID NOT PERMIT PLAINTIFF
      TO PUT ON A SINGLE WITNESS IN DEFENSE OF THE PERJURED
      ACCUSATIONS AGAINST HIM.

20

After all the unsworn, uncrossed, hearsay and perjured testimony was offered by Miss. Halabe, and her cohorts, Petitioner AGAIN objected to the hearsay and then said "I have witnesses I would like to call." (T 11/08/02 P. 27 L. 7). J. Smith said "I want affidavits from everybody if we're going to do this by affidavit. I want to pass this 30 days." (id. L. 9). Plaintiff then said:

> Your Honor, that's unfair to my witnesses that have come today to testify that they have – to not get heard and have to come back at another time. And [is it] fair for affidavits which you know are not subject to cross-examination? I saw this affidavit. It doesn't even allege firsthand knowledge. And, in fact, none of it is firsthand knowledge. (Id. P. 29 L. 5).

Thus not only did Plaintiff not get to put up a single witness, J. Smith wanted to have a hearing by affidavit which presented two problems for Plaintiff. Of course, Halabe's witnesses would then not be subject to cross-examination, and Plaintiff is entitled to compulsory process of a hostile witness. While most of the Congregants would not lie in court, the several Rabbis and lawyers (listed ~~infra~~ supra) did not want to voluntarily come to court to be embattled in a community dispute. By having a hearing "by affidavit" Plaintiff would not have the benefit of the testimony favorable to Plaintiff. In other words, you can't force someone to prepare an affidavit, but Plaintiff was entitled to compel people to come to court and tell the truth. Plaintiff did in fact subpoena several people that were sitting in the courtroom waiting to testify. J. Smith saw Plaintiff's witnesses and didn't allow them to testify, after having Halabe's witnesses give uncrossed testimony.

E.   JUDGE SMITH DID EVERYTHING IN HIS POWER TO PREVENT PLAINTIFF FROM APPEALING HIS CORRUPT AND MALICIOUS RULINGS

After J. Smith denied Plaintiff every Constitutional Right, including but not limited to confrontation of accusers and right to put on a defense, Plaintiff IMMEDIATELY went to file a

21

Notice of Appeal and Application to proceed IFP (attached with original Complaint). The problem of course is that J. Smith summarily rejected it, without every notifying Plaintiff and without ever giving Plaintiff a reason. Plaintiff asks this Court to take Judicial Notice that it already decided Plaintiff qualifies for IFP status.

Of course J. Smith never gave Plaintiff a reason why IFP was denied, and also did not give Attorney Chip Siegel a reason either. (T. 11/22/ 02 P. 7 L. 19). As stated on the transcript, even to appeal the denial of the IFP, the District Court charges a filing fee. (Id. P. 8 L. 21). Thus plaintiff was not even able to appeal the decision that denied Plaintiff every Constitutional Right. This was not the only time J. Smith prevented Plaintiff from appealing.

While J. Smith and Clark County were obligated to provide an attorney, for the hearing on December 20, 2002, which did result in a jail sentence, *Alabama v. Shelton,* 535 U.S. 654, J. Smith and Clark County were further obligated to provide Plaintiff an attorney to appeal the incorrect decision sentencing Plaintiff to jail on December 20, 2002, *Ross v. Moffitt,* 417 U.S. 600, 94 S. Ct. 2437.

J. Smith did not provide an attorney for the hearing on December 20, 2002, thereby causing a relative to hire Attorney Chip Siegel to "represent Plaintiff."[12] As Mr. Siegel stated on the record, Plaintiff did not pay for Mr. Siegel's services, and or costs, and even though someone else paid his actual fee, the costs of required documents were not paid for and therefore were never obtained. (T 12/20/02 P. 28-30). Mr. Siegel did not subpoena a single witness, as costs for witness fees were not advanced to him, and he admitted to being unable to put forward a

---

[12]In fact, Plaintiff never retained Mr. Siegel, and Mr. Siegel's representation was a conflict that he never should have accepted, as the relative that hired Mr. Siegel had adverse interests to Plaintiff and Mr. Siegel did not represent Plaintiff's best interest.

defense. (T 12/20/02 P. 5 L. 1). State of Nevada has ruled that the government must pays costs to a privately retained attorney when the accused can't afford them. *Widdis v. State of Nevada,* 968 P.2d 1165 (Supreme Court of NV, 1998). J. Smith knew that he both had to provide Plaintiff an attorney, and pay the costs necessary to prepare a defense. J. Smith "stalled" Plaintiff by telling Mr. Siegel to "put it [his request for costs] in writing." (id. P. 30 L. 1). Mr. Siegel did put it in writing, and the Motion was calendared. J. Smith again knew that the government was required to pay the costs per *Widdis.* When Mr. Siegel next came to court to argue the Widdis Motion, and J. Smith summarily denied all relief asked for, Mr. Siegel asked "Judge, just for the record, is there a particular basis?" J. Smith replied "you no longer represent him. Thank you. You can go." (id. P. 14 L. 9). In fact, Mr. Siegel, despite not representing Plaintiff on any prospective matter, twice explicitly said "I am prepared to handle the witness [Widdis] motion" (id. P. 2 L. 24) and "I would like to argue the witness [Widdis] motion" (id. P. 3 L. 8). Thus clearly, Mr. Siegel should have been allowed to argue the Widdis Motion, but J. Smith didn't allow Mr. Siegel to so argue, because that would have forced the County and J. Smith to pay the costs. There was no way J. Smith was going to follow the Constitution when it came to Plaintiff. Of course, J. Smith also summarily denied an appellate attorney. (id. P. 6 L. 22). Thus, JUDGE SMITH NEVER INTENDED FOR PLAINTIFF TO HAVE ANY CONSTITUTIONAL RIGHTS, HIS ACTIONS WERE WITHOUT JURISDICTION AND ARE NOT PROTECTED BY JUDICIAL IMMUNITY

3.     THE RATIONALE AND JUSTIFICATION FOR JUDICIAL IMMUNITY ARE
       TOTALLY INAPPLICABLE TO THE FACTS OF THIS CASE.

       The purpose and justification for Judicial Immunity is for the litigants to have an unbiased decision maker, and the justification is that when a judge should make a mistake, the

23

party's remedy is to appeal.

It is abundantly clear that J. Smith was never unbiased, and in fact was totally biased, bordering extreme intolerance for Plaintiff exercising Constitutional Rights. Without any sworn testimony, and without being permitted to put on any defense, J. Smith said about Plaintiff "I think you're crazy." (T 11/08/02 P. 29 L. 25). J. Smith also said about Plaintiff, immediately after stating that "if there's an official investigation through Israel and whoever does the ordinations...that isn't going to be a violation...." then Wyne said Plaintiff spoke with "Rabbi Weinberg who is the person who ordained me..." to which J. Smith replied "and hopefully, Rabbi Weinberg will tell him to go flake off or told him to go flake off." (T 12/20/02 P. 21 L. 4 et seq.). Aside from the obvious professionalism issues, it is an outright biased comment from a judge that never intended to be fair and impartial. It is further not a Judicial Act to make such biased comments. JUDGE SMITH IS THEREFORE NOT ENTITLED TO JUDICIAL IMMUNITY. Of course J. Smith "buttered up" the other side and said to Wyne, "because the reputation that I hear of, you're a wonderful man." (T 12/20/02 P. 21 L. 20).

As clearly stated, all proceedings were designed to get Plaintiff to move out of Las Vegas. In furtherance of that objective, with full bias against Plaintiff, and without any sworn testimony, J. Smith Ordered Plaintiff to stay five blocks away from YIAH, despite knowing that Plaintiff lived within two blocks of YIAH. (T 11/08/02 P. 20 L. 11 & P. 29 L. 18) J. Smith ordered Plaintiff to stay 5 blocks away from Chabad on Arville Road, despite knowing that Plaintiff supplied the caterer at that property with pallets of kosher food and delivered food to individuals at that address. (id. P. 19 L. 9). J. Smith further knew that the property had two totally separate entrances (on two different blocks) and that there was no need to order Plaintiff to stay five

24

blocks away from that property.  J. Smith further knew that Ms. Halabe would only be at that property during school hours, that Chabad was a synagogue besides a school, and that there was no reason to exclude Plaintiff from that property during non-school hours and during non-school days.  THE ONLY REASON FOR EXCLUDING PLAINTIFF FROM CHABAD ON ARVILLE ROAD WAS TO ILLEGALLY TERMINATE PLAINTIFF'S BUSINESS AND FORCE HIM TO MOVE OUT OF LAS VEGAS.  Wyne was further retaliating at Plaintiff for going to the Synagogue at Arville Road to have his baby girl named.  Most vicious of all, was J. Smith ordering Plaintiff to stay five blocks away from the Plaintiff's children's school, when in Court, after J. Smith said twice that my kids were not welcome at the school, the Principal Rabbi Rodman clearly said they were welcome and he would personally pick them up a block away. $\left(T \cdot \frac{1}{8}/\omega\right)$ $\left(r. 14 + 16\right)$ Nevertheless, J. Smith ordered Plaintiff to be five blocks away.  Thus, J. Smith effectively prevented Plaintiff from going to the Place of Religious Worship, prevented Plaintiff's children from going to the school they had gone to for a year before Ms. Halabe even thought about sending her kid there, and effectively terminated Plaintiff's business all without affording basic Constitutional Due Process protections.

J. Smith is certainly not the first corrupt judge, and most assuredly will not be the last.  Mr. Gower states the remedy for Plaintiff is to appeal the several Unconstitutional rulings J. Smith made.  In fact, the justification for giving corrupt judges immunity is that the party can appeal. *Pierson v. Ray*, 386 us 547, 553.  HOWEVER, WE MUST NEVER PERMIT A JUDGE TO USE JUDICIAL IMMUNITY AS AN OFFENSIVE WEAPON, TO ORDER A PERSON TO APPEAR 6 OR MORE TIMES, WHEN THE COURT ABSOLUTELY HAS NO JURISDICTION OVER THE PERSON, INCARCERATE THE PERSON WITHOUT

JURISDICTION, AND TO TOP IT OFF, PREVENT THE PERSON FROM FILING AN

APPEAL, BOTH BY NOT ALLOWING THE ACTUAL FILING OF THE APPEAL, AND BY

NOT PROVIDING CONSTITUTIONALLY ENTITLED COUNSEL FOR THE APPEAL.

Thus, even were this Court to reject every Jurisdictional Argument, this Court still must rule that

Judge Smith is not entitled to Judicial Immunity.

4.    THERE HAS BEEN SUPREME COURT OPINIONS AND LEGISLATION THAT
       GIVES THIS COURT NEW REASONS TO REVISIT JUDICIAL IMMUNITY.

While we do not want judges being sued and being forced to defend themselves, we let a

sitting President of the United States face a civil trial, *Clinton v. Jones,* 520 U.S. 681, and

Clinton exposing himself to Ms. Jones did not result in incarceration of Ms. Jones.

Furthermore, the remedy of appeal, even if J. Smith hadn't prevented Plaintiff from

appealing is inadequate. We now know that at least 13 percent of inmates will be sexually

assaulted in prison. The first 48 hours of incarceration could be the most dangerous. Inmates

that are raped in prison are more likely to not maintain stable employment and are more likely to

be homeless. *Prison Rape Elimination Act of 2003,* 108 P.L. 79. Congress and the Supreme

Court has recognized that being sexually assaulted in prison, and the government's indifference

to that risk is a violation of one's Eighth Amendment Rights. *Farmer v. Brennan,* 511 U.S. 825.

Thus appeal is not a valid or adequate remedy. Additionally, with all the due respect to Your

Honor, Plaintiff filed his case on May 08, 2003, to enjoin a state court from exercising

jurisdiction that the state court had lost approximately 6 months before for not providing counsel

to Plaintiff. Yet J. Smith of course still Ordered Plaintiff into court several times more and

incarcerated Plaintiff. Again, with all due respect, Your Honor did not decide Plaintiff's IFP

Motion, and the Complaint was therefore not filed for more than three months. That is a death

sentence before Judge Smith, as acknowledged by Congress in the *Prison Rape Elimination Act of 2003.*.

## PLAINTIFF MOVES FOR SUMMARY JUDGEMENT ON REVERSING ALL THE ORDERS ISSUED BY JUDGE SMITH, REIMBURSING PLAINTIFF AND OTHERS FOR ALL SUMS EXPENDED ON DEFENDING CRIMINAL CHARGES IN THE STATE COURTS, AND ON THE ISSUE THAT JUDICIAL IMMUNITY DOES NOT PROTECT JUDGE SMITH IN THE CASE AT BAR.

For all the reasons stated above, it is abundantly clear that there is no genuine issue as to any material fact pertaining to the following, and that the moving party is thereby entitled to a judgment as a matter of law.

1. The Clark County Government and J. Smith were obligated to provide counsel to Plaintiff. They simply can not be allowed to profit by the denial of Constitutionally Protected Rights to Plaintiff. They must be ordered to reimburse Plaintiff and others for all necessary monies paid to defend criminal charges.

2. The State has shown that they are not an adequate forum to try Constitutional issues, or to provide Plaintiff a fair appeal. The Younger Abstention Doctrine therefore does not apply. *Cullen v. Fliegner,* 18 F.3d 96, 103, (2d Cir. 1994). Plaintiff therefore prays this Court reverses all orders of the state court, and most importantly, reverses the convictions for contempt.

3. Plaintiff further prays this Court decides that the record is perfectly clear, that there is no factual and or legal dispute concerning the lack of jurisdiction, that J. Smith repeatedly acted in absence of jurisdiction to the detriment of Plaintiff, and that Judicial Immunity does not apply to Judge Smith. Plaintiff therefore asks this Court to grant Summary Judgment as to liability.

4. Plaintiff has shown beyond doubt that all Defendants will conspire to incarcerate Plaintiff and Plaintiff must be free to depose said Defendants without being jailed for no reason at all. All

government Defendants have demonstrated that they will incarcerate Plaintiff even though

Plaintiff has not committed any crime and the Court has not had jurisdiction. PLAINTIFF

THEREFORE REQUIRES AN INJUNCTION AGAINST ALL GOVERNMENT

DEFENDANTS FROM INCARCERATING PLAINTIFF, AND FROM ISSUING

PROTECTION ORDERS THAT WOULD PREVENT PLAINTIFF FROM CONDUCTING

DISCOVERY AS WELL AS BEING PRESENT FOR THE ACTUAL TRIAL.

## CONCLUSION

It is beyond dispute that J. Smith acted under color of authority, and did deprive Plaintiff,

a citizen of the United States, his Constitutional rights, including but not limited to, the right to

not be deprived of liberty, the right to choose a profession or business of one's calling and not

have his business confiscated by the government, the right to be represented by counsel in any

criminal proceeding which results in a jail sentence, the right to worship free of intimidation, in

violation of 18 USC § 248 (a)(2), the right to not be incarcerated when no crime was committed

and when the court was completely absent of all jurisdiction, and numerous other Constitutional

rights, privileges and immunities.

The record speaks for itself, leaves no room for any factual dispute, that J. Smith did act

in complete absence of jurisdiction, thereby losing any privilege of judicial immunity. The

record further demonstrates that there is no chance that the state courts is an adequate forum to

litigate the Constitutional issues. Therefore, Younger Abstention Doctrine does not apply.

That Plaintiff is therefore entitled to Summary Judgment as to liability against J. Smith

and Clark County. The Plaintiff is further entitled to Injunctive Relief against any further state

proceedings and is entitled to have all Orders, including findings of contempt, reversed and

vacated.

Dated this 18th day of March , 2004

Yaakov Vann

Plaintiff Pro Se
7186  SAN SALVADOE  DR
BOCA  RATON,  FL  33433
   561  305-8042

### CERTIFICATE OF MAILING

I hereby certify that on 18th day of October 2004, I deposited in the United States Mail, postage

paid, at Boca Raton, FL, Enclosed in a sealed envelope, a copy of *PLAINTIFF'S ANSWER TO*

*COUNTY DEFENDANTS' MOTION TO DISMISS STATE OF NEVADA AND CROSS*

*MOTION FOR SUMMARY JUDGMENT* addressed to:

Robert Gower, Attny for Clark County Defendants
500 S. Grand Central Pkwy.
P.O. Box 552215
Las Vegas, NV  89155-2215

Jason Burk
Atty for Wyne, Halabe and Dubowsky
1701 W. Charleston Blvd.
Las Vegas, NV  89102

Adina Mayerhoff

ב״ה

# Young Israel  Aish HaTorah

### LAS VEGAS *

**Rabbi Yitzchak Wyne**

Underline{President}
Peter Dubowsky, Esq.

Underline{Chairman of the Board}
Dr. Yuri Itkis

Underline{Treasurer}
Jeralyn Goldman

**Board of Directors**
Simon Abraham
Anthony Bock
Jack Coronel
David Ghermezian
Amy Mufson
Bob Papock
Adrienne Rush
Beth Sroka
Jessica Stockman
Linda Wilner

* Founded by
   Torah U'Mesorah

September 1, 2002

Dear Yackov,

It is my pleasure to inform you that you will be given the honor of Hagba on the first sefer Torah on the second day of Rosh Hashanah, Sunday, September 8, 2002. Shachris begins at 9:00 pm and the Torah reading service will be at about 10:30 am.

Jewish Tradition teaches that there are special blessings bestowed from heaven upon those who receive Aliyot, especially at this time of year. It is also customary to give a donation to charity for these honors.

It is really wonderful to have you and Adina and the kids as part of our community. I appreciate knowing that I have you "on call" for certain responsibilities in the shul.

 Thank you for your participation and support. May the Almighty send you and your family blessings for health and prosperity, happiness and wisdom in the coming year.

With love and blessings,

Rabbi Yitzchak Wyne

9590 West Sahara Avenue, Las Vegas, Nevada 89117
PHONE: (702) 360-8909     FAX: (702) 360-8908     E-MAIL: ywyne@aish.com
WEBSITE: aish.com/branches/las_vegas

657-919



THIS CONTRACT LIMITS OUR LIABILITY.
PLEASE READ

The holder entitles the holder to the use of one parking space.
Acceptance of this ticket constitutes an agreement between the
holder and the Golden Nugget.  The holder agrees that the
Golden Nugget shall not be responsible for the loss or damage to
the vehicle, its accessories, or contents, resulting from theft, fire,
collision, or any other cause.  No employee of the Golden Nugget
is authorized to change the conditions of this ticket.

04/20/03 08:09    B 950:450A

REMAND

Page 1 of 1

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**TEMPORARY CUSTODY RECORD**

I.D. #: 1696037   Event #: _____

TIME OF ARREST: 0905

DATE OF ARREST: 4-2-03

NAME (AKA, ALIAS, ETC.): Last VRAKOV   First YAAKOV   Middle

TRUE NAME: Last VAIN   First YAAKOV   Middle

ADDRESS NUMBER & STREET: 200 S. THIRD LVNV

DATE OF BIRTH: 08/10/67   RACE: W   SEX: M   HEIGHT: 5'11   WEIGHT: 210   HAIR: BRN   EYES: BRN

BLDG./APT. #

Citizen Arrest: Y / N

CITY: LV   STATE: NV   ZIP

SOCIAL SECURITY #: 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

PLACE OF BIRTH: NEW YORK

LOCATION OF ARREST: 200 S. THIRD

Speak English? Yes / No

LOCATION OF CRIME (# - Street - City - State - Zip): 200 S. THIRD LVNV

I.D. ESTAB. BY: _____

BEG CODE | CHARGE ORD / NRS #

d/o/c   NRS 199,340

NO BAIL

ARREST TYPE: PC – PROBABLE CAUSE   BS – BONDSMAN SURRENDER   BW – BENCH WARRANT   WA – WARRANT   RM – REMAND   GJI – GRAND JURY IND.

ARR TYPE: RM

EVENT NUMBER: 021009864

WARR / NCIC NUMBER: 021009864X   PCN #

COURT: LV  JC  DC  OTHER

APPROVAL CONTROL # FOR ADDITIONAL CHARGES:

OTHER COURT:

Arresting Officer's Signature

(Print Name) T. ERNE   P #: 11672   Agency: TCVN

Transporting Officer's Signature

(Print Name) D- ROSSE   P #: 147 / 3C   Agency

BOOKING: Time Stamp

RECEIVED
03 APR -2   09:43

DCD RECORDS

☐ FOR PROBABLE CAUSE/NCIC HIT ARREST SEE PAGE TWO FOR DETAILS.
☐ BENCH WARRANT SERVED ON _____
☐ WARRANT SERVED ON _____
☐ GRAND JURY INDICTMENT SERVED ON _____
☐ TYPE OF I.D. FOR VERIFICATION _____

OFFICER MUST SIGN SECOND PAGE WITH ORIGINAL SIGNATURE

PHOTO

(1) CENTRAL RECORDS - ORIGINAL

LVMPD 22 (REV. 7-99)

P #:

EXHIBIT C

# PURCHASE ORDER

VENDOR 7882

THE VENETIAN®
Resort·Hotel·Casino

V/AAKOV VANN
ID./B./A  KOSHER FOR LESS
2101 WEST SAHARA  #105-150
LAS VEGAS, NV 89117
VENDOR PHONE:  804-0351
VENDOR FAX  :  804-0351

DATE 11/18/02
PAGE  1

SUPER MEJIAB

VENDOR TAX #

PO, KOSHER MUST APPEAR ON INVOICES, STATEMENTS, FREIGHT LOADS COUPONS AND BILLS OF LADING. MAIL INVOICES TO:

The Venetian
Accounts Payable
3355 Las Vegas Blvd. So.
Las Vegas, NV 89109

SHIP TO LOCATION

RECEIVING (LOCATION ONLY)
3355 LAS VEGAS BOULEVARD SOUTH
LAS VEGAS NV 89109

| PURCHASE ORDER # | 00118483 |
| REQUISITION # | |
| | DATE REQUIRED  11/17/02 |
| | MOD #  0 |
| | CONST. P.O. # |
| FOB | |
| SHIP VIA | |
| PAYMENT TERMS | NET 10 |
| JOB COST # | |
| PROJECT # | |
| CHG. DIVISION | FOOD |
| CHG. DEPT. | BANQUETS  KITCHEN |
| CONFIRMING ORDER | N |
| CREDIT REQUEST | N |

| QUANTITY | UM | ITEM # | DESCRIPTION | | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|---|
| 2 | CASE | 1350008 | SALMON, SMOKED #1 .............12/3#CASE | | 1.00 | 86.86 |
| | | | ORDER WAS DELIVERED OVER WEEKEND FOR EMERGENCY | | | |
| | | | PLEASE FAX INVOICE FOR PAYMENT | | | |

COMMENTS:

| LINES | GROSS AMOUNT | FREIGHT & MISC. | TAX AMOUNT | DISCOUNT AMOUNT | NET AMOUNT |
|---|---|---|---|---|---|
| 1 | 86.86 | .00 | .00 | .00 | 86.86 |

TOTALS

ACCEPTANCE OF THIS ORDER IS EXPRESSLY LIMITED TO THE PROVISIONS HEREOF, INCLUDING THOSE ON THE FACE AND REVERSE SIDE HEREOF. ANY ADDITIONAL OR DIFFERENT TERMS MUST HAVE AUTHORIZED VENDOR'S SIGNATURE ON COPY OF PURCHASE ORDER RETURNED TO THE VENETIAN BUYER IMMEDIATELY IN ORDER TO PROCESS PAYMENT AFTER PURCHASE HAS BEEN RECEIVED.

VENDOR
SIGNATURE _____

Executive
Vice President _____

PURCHASING

CASE No. CVS-03-0507 pmr(PAL)

FILED

TRAN
CASE NO. PROTECTIVE ORDER                    Mar 26   9 30 AM '03

JUSTICE COURT

IN THE JUSTICE'S COURT OF LAS VEGAS TOWNSHIP
                                        BY _____
                                                    DEPUTY
COUNTY OF CLARK, STATE OF NEVADA


MICHELLE HALABE,                    )        **ORIGINAL**
                                    )
            Plaintiff,              )
                                    )
    vs.                             )    CASE NO. 02PO0996X
                                    )
YAAKOV VANN,                        )
                                    )
            Defendant.              )
_____)


**REPORTER'S TRANSCRIPT**

**OF**

**PROCEEDINGS**

**BEFORE THE HONORABLE DOUGLAS SMITH
JUSTICE OF THE PEACE**

FRIDAY, NOVEMBER 22, 2002


APPEARANCES:


 For the Plaintiff:              IN PROPER PERSON


 For the Defendant:              JAY SIEGEL, ESQ.


Reported by: Therese Ferriola, CCR #314

THERESE FERRIOLA
OFFICIAL COURT REPORTER
(702) 455-3048

```
1    LAS VEGAS, NEVADA, NOVEMBER 22, 2002, 8:30 A.M.

2

3                        *  *  *  *  *

4

5          THE COURT:  O2PO-996 Yaakov Vann, and

6    O2PO-1040.

7               Actually, this is Judge

8    Abbatangelo's.

9          (Discussion held off the record.)

10         THE COURT:  All right.  It is on for a

11   contempt.  I got a telephone call from Attorney --

12         MR. SIEGEL:  Chip Siegel.

13         THE COURT:  Chip Siegel who asked to

14   continue the hearing, and I told him that the

15   protective order is in place and I will continue it.

16   And I notified all parties.

17         MR. SIEGEL:  Can I be heard just for a

18   second?

19         THE COURT:  Yes.

20         MR. SIEGEL:  A couple of things, Judge.  I

21   want to -- well, thanks for continuing the hearing,

22   first and foremost.  We appreciate that.

23               Secondly, I just need to know

24   procedurally where we're at.  My client had a couple

25   of questions.  My understanding is, because I read
```

THERESE FERRIOLA
OFFICIAL COURT REPORTER

```
 1   specialty for this area of the city, for people who
 2   are orthodox and keep Kosher.  And one of his bigger
 3   suppliers apparently has a catering business that's
 4   located in the kitchen on this property.
 5             THE COURT:  Who is that?
 6             MR. SIEGEL:  Ravi's catering.
 7             THE COURT:  It's in this?
 8             MR. SIEGEL:  It's in the affidavit.
 9             THE COURT:  I'm going to check that out.
10             MR. SIEGEL:  The other thing is I wanted
11   to point out to the Court I had -- Mr. Vann
12   explained to me and I have a little bit of a diagram
13   if your Honor would like to take a look at it.
14             THE COURT: Yes.
15             MR. SIEGEL:  It looks like there are three
16   buildings on this property.  This kitchen is in one
17   corner of one building.  And I asked Mr. Vann, and
18   he said that there is an entrance directly into the
19   kitchen.  And so we would be asking if there's any
20   way he could just get into that kitchen for the
21   limited purpose of delivering to Ravi's Catering and
22   to people who are picking up -- apparently the
23   people from this community pick up the food from
24   Mr. Vann.  He can't do it at his house because that
25   would violate health codes.  It has to be, you know,
```

1  a different location.  That would be the only

2  relief.

3         THE COURT:  So where is he receiving the

4  food?

5         MR. SIEGEL:  He has to go -- he has a

6  warehouse.  The problem is you can't get everybody

7  to come to the warehouse.  If he has to go

8  individually, he has to charge them for that.

9         THE COURT:  Who's the Rabbi that's the

10 head of the school?

11        MR. SIEGEL:  I'm sorry?

12        THE COURT:  Who is the head of the school?

13        MR. SIEGEL:  I believe it's Rabbi Harlin.

14        THE COURT:  All right.  We'll call Rabbi

15 Harlin to see if what he's telling me is accurate.

16        MR. SIEGEL:  Okay.  The other thing,

17 Judge, is the court reporter was nice enough to

18 allow me to take a quick look at the transcript, and

19 it seems that there might be a little bit of a

20 factual question that's going to come up in this

21 hearing and that is whether my client is accused of

22 pushing the Rabbi at a function or whether somebody

23 else --

24        THE COURT:  You know what, if he was at

25 the function, then he's violated the protective

```
 1   order.  He is to have no contact with the Rabbi.
 2   That doesn't mean physical, that means within the
 3   area.
 4           MR. SIEGEL:  Judge, again, I don't want to
 5   make this a protracted hearing.
 6           THE COURT:  It is not.
 7           MR. SIEGEL:  I know.  I read the order,
 8   and the order did not have a piece of language that
 9   I thought it would have, because I thought the
10   similar -- and before I finish, it doesn't have the
11   standard language in there of keeping a thousand
12   feet away.  I know in another one you said five
13   blocks which is a whole other issue.
14                   If you read the order, what he would
15   have done --
16           THE COURT:  Well, this isn't the time for
17   this hearing.
18           MR. SIEGEL:  That's what I am saying.  But
19   you're saying you do.  You understand, you kind of
20   brought that up.
21           THE COURT:  I will look at that.
22           MR. SIEGEL:  The only reason for that is I
23   need time to prepare.  I need probably about two
24   weeks.  I know this order is going to continue
25   during that time.
```

| | |
|---|---|
| 1 | THE COURT: The order will continue. |
| 2 | MR. SIEGEL: Thank you. |
| 3 | THE COURT: But I also have an officer |
| 4 | here that I forgot to call, I'm sorry, that has |
| 5 | numerous counts against this man. And I want you to |
| 6 | talk to her before you leave. |
| 7 | MR. SIEGEL: I will. The final thing -- |
| 8 | THE COURT: Okay. |
| 9 | MR. SIEGEL: -- because the order is in |
| 10 | place, and, your Honor, I would like you to |
| 11 | understand this: I represent Mr. Vann at this point |
| 12 | for the specific purpose of an allegation violating |
| 13 | a protective order. |
| 14 | THE COURT: That's it. |
| 15 | MR. SIEGEL: That is the limited nature. |
| 16 | THE COURT: That is the limited nature and |
| 17 | that's the limited nature of the hearing that we'll |
| 18 | have. |
| 19 | MR. SIEGEL: Thank you. He also has |
| 20 | certain appellate rights, if he wishes to do that. |
| 21 | He wants to proceed in forma pauperis on his own. |
| 22 | THE COURT: That was denied. He filed a |
| 23 | motion. You mean he wants to proceed pro per? |
| 24 | MR. SIEGEL: Well, but he is -- unless you |
| 25 | need a financial affidavit. He went to go and |

1  appeal.  They would not let him appeal because he

2  did not file the fees.

3          THE COURT:  His in forma pauperis was

4  denied.

5          MR. SIEGEL:  Okay.  Can I revisit that,

6  only because he wants to do that on his own?

7          THE COURT:  Well, you represent him just

8  for the issue of whether he violated Judge

9  Abbatangelo's.  You see, under the law, Abbatangelo

10 can't hear it.  Somebody else who's separate and

11 apart has to hear it.  That's what I'm hearing.

12         MR. SIEGEL:  And, again, I don't want to

13 talk about the violation and the TPO, the protective

14 order, because we're going to have this hearing and

15 I know you're going to set it.  I am talking about

16 something else.  I am talking about him on his own

17 wanting to be able to appeal a final order, that is,

18 the issuing of the protective order.

19         THE COURT:  He can appeal my denial of his

20 in forma pauperis.

21         MR. SIEGEL:  The problem is I know they

22 get kind of semantic here.  They won't let him

23 unless he pays the fee.  And what he's saying is he

24 can't pay the fee.  Is there any reason that

25 your Honor will not allow him to proceed that way?

1    Does he need to give you a financial affidavit?

2           THE COURT: He doesn't meet the

3    requirements.

4           MR. SIEGEL: And if he presents a

5    financial affidavit to you?

6           THE COURT: He'll have to do what he's got

7    do.  He knows what to do.  He went to law school.

8           MR. SIEGEL: I understand that, Judge.  I

9    just wanted to clarify.

10          THE COURT: He has to do what he has to

11   do, and I have to do what I have to do.

12          MR. SIEGEL: The next thing if I can ask

13   leave of the Court for a moment to discuss.

14          (Discussion held off the record.)

15          MR. SIEGEL: Okay.  Judge, the other

16   relief that he would ask for is, as you can see, his

17   children are here today; the reason is his wife was

18   unable to take the kids to school.  Your Honor has

19   an order keeping him five blocks away from the

20   school, which I think that is an unintended

21   consequence.  Maybe if your Honor was to know the

22   effect it's having on his children.  Is there any

23   sort of relief your Honor wants to -- okay.

24          THE COURT: No.  He is too much trouble.

25   He's trouble.  And it's unfortunate that he has

1  drawn children into this, not only his own but

2  others.

3          MR. SIEGEL:  The best thing to do,

4  your Honor --

5          THE COURT:  We'll set this for a hearing

6  in two weeks.

7          MR. SIEGEL:  I'm going to need --

8          THE COURT:  And what you didn't include in

9  this affidavit, which I expected, was what financial

10  loss this would be, if this is such a terrible

11  financial loss.

12          MR. SIEGEL:  Okay.  You want --

13          THE COURT:  I want to know how much he

14  says because I'm going to call the Rabbi, and if

15  he's not being truthful to me, then I've got it in

16  an affidavit.

17          MR. SIEGEL:  What I will do is supplement

18  the financial.

19          THE COURT:  All right.

20          MR. SIEGEL:  Hang on a second.

21          THE COURT:  You don't have any problem

22  with my calling Rabbi Harlin?

23          MR. SIEGEL:  Do I?

24          THE COURT:  Yes.

25          MR. SIEGEL:  No, because what you're doing

```
 1   is trying to see if he can get back on his behalf.
 2              THE COURT:  I may even visit the school
 3   personally.
 4              MR. SIEGEL:  If you want company, let me
 5   know.
 6              THE COURT:  Well, you've got other things
 7   going today.
 8              MR. SIEGEL:  Today, yeah, I'm in a hearing
 9   all day, Judge.
10              How does the week of the 9th look for
11   your court, Miss Clerk?
12              And if your Honor wants to, if I
13   might make a suggestion, do you want to do 1:00
14   o'clock?
15              THE COURT:  We're going to set this one
16   alone, so we'll set this on a Friday because then
17   it's the only case I'm setting.
18              MR. SIEGEL:  Then I would ask December --
19   I can't do December 13th.  December 6th?
20              (Discussion held off the record.)
21              MR. SIEGEL:  Judge, are you available
22   December the 20th?
23              THE COURT:  Yes, 8:30.
24              MR. SIEGEL:  December the 20th at 8:30?
25              THE COURT:  The protective order is still
```

1   in effect, unless I notify you.  I will contact you

2   personally.  And the reason I have, Chip, the reason

3   I'm doing all the work is because the prosecutors

4   don't feel that it's their responsibility, so I am

5   left with no other alternative.

6           MR. SIEGEL:  What you're doing, you're

7   also putting yourself in a pretty funky position.

8           THE COURT:  Maybe I will have an

9   investigator go out and check it.  I won't go out

10  there, but I will call Rabbi Harlin.

11          MR. SIEGEL:  Here's one of our concerns,

12  and I think your Honor is already sensing, is you're

13  putting yourself in a position where you might end

14  up having to have another judge hear this if you get

15  too involved before evidentiary hearings.

16          THE COURT:  Then file the proper

17  affidavit.

18          MR. SIEGEL:  I know.  If we choose to do

19  that, we would.  I am aware of that.

20          THE COURT:  Here is what I will do:  I

21  know that Rabbi Harlin has an attorney.  I will

22  contact the attorney and ask him to file an adverse

23  affidavit to what effect it would have on his

24  school.

25          MR. SIEGEL:  And just so we're clear, I

1  have spoken to that attorney.  I have also spoken to

2  Rabbi Harlin.  You know, I don't have a problem with

3  your Honor --

4          THE COURT:  No.  I won't contact him,

5  you're right, because I don't want to be disruptive

6  to this because I have already been involved in this

7  hearing, and it's going to go forward in front of

8  me.

9          MR. SIEGEL:  Okay.

10          THE COURT:  Okay.

11          MR. SIEGEL:  So just to recap,

12  December 20th we have a hearing at this point?

13          THE COURT:  Just on the narrow issues did

14  he violate Judge Abbatangelo's --

15          MR. SIEGEL:  Protective order.

16          THE COURT:  -- protective order.

17          MR. SIEGEL:  The next thing that we have

18  is you're going to contact the other side's

19  attorney.  Well, I shouldn't say the other side, the

20  attorney for Rabbi Harlin.

21          THE COURT:  And ask him to file an

22  affidavit on what impact it would have on the

23  school.

24          MR. SIEGEL:  If he were to be allowed for

25  that limited purpose.

```
 1              THE COURT:  Yes.

 2              MR. SIEGEL:  And the other thing you would

 3   like is you would like a financial affidavit from my

 4   client as far as revisiting your issue of allowing

 5   him to proceed in forma pauperis on his appeal

 6   not --

 7              THE COURT:  He has to have that as a

 8   separate issue.

 9              MR. SIEGEL:  Okay.

10              THE COURT:  He'll have to figure it out.

11   He's a lawyer; he's smart.  You'll have to figure

12   out how to get around that.

13              MR. SIEGEL:  Okay.

14              THE COURT:  All right.  Thanks.

15              MR. KEPHART:  Your Honor, just as a friend

16   of the Court in this matter, Officer Kosmides had

17   asked me, in listening to this, she asked me if I

18   would address the Court, and she --

19              THE COURT:  Well, I think you guys should

20   be prosecuting this.

21              MR. KEPHART:  Well, I don't have the case

22   here.  We don't have anything here.  You know, if I

23   did --

24              THE COURT:  Actually, actually, if they

25   filed a complaint, they probably should file a
```

THERESE FERRIOLA
OFFICIAL COURT REPORTER

```
 1  complaint with Metro, it should go through the DA's
 2  office.  That should happen.  If there's a
 3  protective order he's violated, there should be a
 4  separate case.  But this is not the issue of whether
 5  there's a separate case.  This is the contempt order
 6  on whether he violated the protective order.
 7              MR. KEPHART:  Well, my question from
 8  Officer Kosmides was that during the pendency of
 9  this until I guess it's December 20th is the date,
10  if he, in fact, is in violation of the protective
11  order besides this --
12              THE COURT:  He's to go to jail.
13              MR. KEPHART:  Can they -- okay.
14              THE COURT:  Absolutely.
15              MR. SIEGEL:  They didn't know if this was
16  putting that on hold or anything.
17              THE COURT:  No.
18              MR. SIEGEL:  My understanding is the
19  protective order is still in effect.  All we've done
20  today is to stay the hearing that was scheduled for
21  today.
22              THE COURT:  For today on the question of
23  whether he violated Judge Abbatangelo's protective
24  order with Rabbi Wine and himself.
25              MR. SIEGEL:  Okay.
```

1          THE COURT:   Everything else is still in

2   order.

3          MR. SIEGEL:   Understood.

4          THE COURT:   Okay?

5          MR. SIEGEL:   Yes.

6          THE COURT:   Thank you.

7

8      (Whereupon, the proceedings were concluded.)

9

10                    * * * * *

11   Attest: Full, true, accurate transcript of proceedings.

12

13   THERESE FERRIOLA, CCR #374

14

15

16

17

18

19

20

21

22

23

24

25

FILED

1

1    TRAN                              Mar 26   9 30 AM '03
     CASE NO. PROTECTIVE ORDER
2                                      JUSTICE'S COURT
                                       LAS VEGAS NEVADA
3        IN THE JUSTICE'S COURT OF LAS VEGAS TOWNSHIP
                                       BY
4            COUNTY OF CLARK, STATE OF NEVADA

5

6    MICHELLE HALABE,              )      **ORIGINAL**
                                   )
7              Plaintiff,          )
                                   )
8        vs.                       )   CASE NO. 02PO0996X
                                   )
9    YAAKOV VANN,                  )
                                   ).
10             Defendant.          )
     _____)
11

12

13                   **REPORTER'S TRANSCRIPT**

14                          **OF**

15                      **PROCEEDINGS**

16       **BEFORE THE HONORABLE DOUGLAS SMITH**
                **JUSTICE OF THE PEACE**
17
                 FRIDAY, MARCH 21, 2003
18

19   APPEARANCES:

20

21    For the Plaintiff:          IN PROPER PERSON

22

23    For the Defendant:          JAY SIEGEL, ESQ.

24

25   Reported by: Therese Ferriola, CCR #314

1    LAS VEGAS, NEVADA, MARCH 21, 2003, 8:30 A.M.

2

3                          * * * * *

4

5         THE COURT:  02P-996, Yaakov Vann.

6         MR. SIEGEL:  Good morning, Judge, Chip

7    Siegel with Mr. Vann.  Judge, I was contacted --

8    actually, I filed a motion that was supposed to be

9    set for the 28th.  Remember when we were in court

10   last time and I indicated I was going to file a

11   witness motion?  I was able to get all the material

12   required for that motion and finally get it together

13   and set it for the 28th.  I did represent Mr. Vann

14   in the prior hearing.

15              I can tell you that any other

16   allegations, I do not represent him on.  I am not

17   going to represent him on any new allegations.

18              It seems that serendipitously I was

19   contacted by the Court that says there could be an

20   accusation of a violation.  I have no idea what the

21   factual basis of that is.

22              And as I've indicated to the Court

23   and I indicated to Mr. Vann, I do not plan on

24   representing him on that particular case.  I am

25   prepared to handle the witness motion.  I can tell

```
 1   you that Mr. Vann will need the time to find another

 2   attorney or if you're going to appoint the public

 3   defender on this most recent allegation.  I know

 4   nothing about it.  I'm not his attorney for that.  I

 5   apologize to the Court, but I think I did indicate

 6   that to whoever -- it wasn't you.  I think it was --

 7   and it wasn't Kathy who contacted me.  I think it

 8   was Department 3.  But I would like to argue the

 9   witness motion.

10              THE COURT:  All right.  Well, this is a

11   request for an appellate attorney.

12              MR. SIEGEL:  It would be a request for an

13   appellate attorney, for fees, for everything that

14   he's expended at this particular point and what he's

15   going to need from here on in.

16              Judge, the question really comes down

17   to, I guess, two things:  Number one is does he

18   qualify financially.  That's a determination that's

19   made by the Court.  Underneath, below that, is a

20   subset of that, then does the Court deem it

21   appropriate, whatever's being requested.  And then

22   the final question would be whether this is a

23   criminal matter.  Witness applies definitely in a

24   criminal matter.  We know that.

25              We also know how this has progressed,
```

1   that your Honor has referred to it as a criminal

2   contempt, has referred many times that this is a

3   criminal contempt-type hearing; and as such, even

4   though it might be filed with a case number of a P,

5   it falls within those parameters, so it should be

6   considered criminal.  As such, Witness applies under

7   the letter of the law.  If not, I believe it could

8   apply by analogy.

9           And so for those reasons, if

10  your Honor finds that he qualifies, the next

11  question is is whether your Honor's going to deem

12  his request appropriate.  Certainly I can tell you

13  that I spent the time necessary to prepare this

14  case.  There were definitely costs that were not

15  borne that he would have liked and I think would

16  have been helpful to any hearing.

17          He does refer to me in this petition

18  as ineffective.  That would be another reason for

19  the request that he be appointed different counsel.

20          He has explained to me that it wasn't

21  ineffective in the terms that we think of whenever I

22  hear that but just because of the Court's orders, I

23  wasn't able to have everything I should have had.

24          Regardless, when somebody makes an

25  allegation like that, I think it's a breakdown in

1   the attorney-client relationship. And that would be

2   another reason that I'm not going to go forward as

3   his attorney.

4         THE COURT: Thank you. You're excused.

5   You can leave.

6         As well, the record should reflect he

7   has accused me of accepting a bribe which is

8   offensive in and of itself and he's said some other

9   things that simply weren't true. He was disruptive

10  in court. He's been disruptive in every court

11  appearance. I've tried to maintain some semblance

12  of judicial order in the court, and I don't seem to

13  be able to with Mr. Vann.

14        Mr. Vann, as well, is not following

15  the Court's order to stay away. I mean, all I was

16  merely trying to do is keep peace for the plaintiffs

17  that filed the complaint who have a right to worship

18  and live without fear, and this man's putting them

19  in fear.

20        Where did the PD go? Where is Danny?

21        MS. MARTINEZ: Outside.

22        THE COURT: You better go get him because

23  he's about to get appointed.

24        Mr. Hastings, this is a protective

25  order that I just relieved Mr. Siegel from

1   representation.  I'm not sure how to proceed.

2   You're appointed, the public defender's office is

3   appointed, to represent Mr. Vann.  I assume

4   Mr. Vann, I believe he could hire an attorney, but

5   in his affidavit he says he's now broke.  He has

6   accused me of accepting a bribe from this Rabbi

7   which defames me and the Rabbi.  He's particularly

8   difficult.  I have bent over backwards.  I mean, I

9   probably should have put him in jail a couple of

10  times ago.  The problem is whether this is construed

11  as a motion to recuse me, the way it's written.

12                 I will not allow and the Supreme

13  Court will not allow an attorney to build in

14  conflict with a judge just by filing a pleading so

15  that he can judge shop.

16                 I believe I can be fair and

17  impartial.  I think I have been very civil to

18  Mr. Vann.  Mr. Vann, by the way, has a law degree,

19  so truly he could represent himself if he wanted.

20  But he's chosen to hire an attorney.  He now says he

21  can't afford an attorney.

22                 I'm not appointing an attorney for

23  him on this, an appellate attorney for him on this

24  matter, but I am appointing the public defender

25  under Shelby versus Alabama.  It's a recent United

1   States Supreme Court case.  If a person's going to

2   jail, he has the right to be afforded an attorney,

3   and out of an abundance of caution.

4           Now, this is like the second or third

5   or fourth violation of my protective order.  Well,

6   if it was criminal, I would hold it right now, and I

7   wouldn't need an attorney appointed.  But I'm not

8   sure that the Supreme Court would agree.

9           This has caused me a lot of grief,

10  not as much as it has caused you guys.  But I've

11  done some research.  I have looked at the law on the

12  contempt process.  The only way I can order him and

13  force him to follow my order is to put him in jail.

14  And if I intend to put him in jail, I have to have

15  an attorney.

16           I also have to have another judge

17  look at the record, review it, to determine whether

18  or not I can proceed on the case.  So what I have to

19  do is randomly reassign it, let the judge have a

20  hearing to determine whether or not I can hear the

21  case, or under I think it's 433 A or B, whether I

22  can hear it.  In any event, if it's deemed civil in

23  nature, then another judge has to hear the

24  violation.

25           So I'm going to randomly have this

 1   randomly reassigned for these issues:  Whether this

 2   is a criminal case or a civil case; two, whether I

 3   should recuse myself; and, three, whether the new

 4   judge should hold the revocation hearing.

 5                        Now, I've done that for other judges

 6   on protective orders and reviewed them.  It has

 7   probably got to go to the chief judge, Ann

 8   Zimmerman.

 9                        But I will not allow him to

10   manipulate this Court because the next one he could

11   say the same thing about the judge until he gets

12   someone he likes.  And that isn't going to happen.

13                        But it may be determined that this is

14   civil and not criminal.  I'll let another judge make

15   that call.  She may or may not send it back to me to

16   make the determination.

17                        You, however, will be his attorney;

18   not you personally, but your office.

19                        MR. SIEGEL:  Judge, if I can just put on

20   the record what I'm going to hand to counsel.  This

21   is, just so he knows what's going on, it's a copy of

22   a motion I filed here that brings us here today.

23   I'm also giving him the various protective order

24   applications as well as some letters.  Also there

25   are three transcripts.

1          THE COURT:  I better order it.  Do we have

2  transcripts of all of the other proceedings?

3          MR. SIEGEL:  Judge, I am handing him the

4  transcript from Friday November 8th of 2002; from

5  Tuesday, November 19th, 2002; and also from

6  December 20th, 2002.  I know they will needed

7  today's transcript.  And I don't know --

8          THE COURT:  Well, I have to order today's

9  transcript to send to Judge Zimmerman so she can

10  review it.

11          MR. SIEGEL:  And apparently there might be

12  one transcript of the first day that I appeared.  I

13  am not sure if your clerk can check that.  I'm

14  sorry.  Miss Court Reporter can check her notes.  I

15  would appreciate that.

16          MR. HASTINGS:  Judge, I have a couple of

17  thoughts.

18          THE COURT:  All right.  Your hearing,

19  Mr. Hastings, will be April 1st.

20          MR. HASTINGS:  I have a couple of

21  thoughts.

22          THE COURT:  Yes.

23          MR. HASTINGS:  First of all, do you know

24  if it would be Judge Zimmerman's practice to handle

25  this herself or to assign it out to another track,

1   because our office is not cross-tracking.

2          THE COURT:  I think that Judge Zimmerman

3   has to hear it as chief judge.  That's why I'm

4   putting it in here on April 1st.  It is not a random

5   retrack.  If she determines that I can't hear it,

6   that it's civil in nature, and she has to answer

7   those three questions, I believe, according to the

8   law.

9          MR. HASTINGS:  Do you know how quickly we

10  can get a transcript of what happened today?

11         THE COURT:  You'll have it before the

12  April 1st hearing, probably Monday.  Cookie will

13  work over the weekend for me.  I will sign an order.

14             In the meantime, I expect your

15  client, Mr. Hastings, to stay away from these

16  people.  I have really tried to make that clear.

17  The problem is we are now kind of entoiled in a

18  rabbinical legal battle.  He is not wanted as a

19  congregant at the Rabbis' temple.

20         RABBI WINE:  Synagogue.

21         THE COURT:  Sorry.  And they voted him

22  out, and he does not have a right to be there.  He

23  lives on the corner near it.  I told him he can go

24  into his house, but he can't go near that synagogue.

25  I believe, and I haven't read it carefully, but he's

1   now stopping people again within 50 feet of that

2   synagogue trying to get information.  He's not

3   allowing them to worship.  He is not following the

4   order the Court.

5            He hasn't recognized the Court, first

6   of all, as having jurisdiction because he doesn't

7   recognize rabbinical law as having jurisdiction.

8            MR. HASTINGS:  Do we know in this case,

9   Judge, regarding the alleged violation date so we

10  know exactly?

11           THE COURT:  It's in the file.

12           MR. HASTINGS:  If there are any new ones,

13  Judge --

14           THE COURT:  I will provide a copy of that

15  to you.  I don't think that there is enough to have

16  me taken off the case because he accused me of a

17  crime.  I can be fair and impartial on that.

18           And, in fact, I talked to the ethics

19  panel to see if I shouldn't remand him to custody

20  today to have a psychiatric evaluation done because

21  I think he's crazy.  I'm still looking up the law to

22  determine whether I can do that.  I just think he

23  has a number of problems.  And you may want to have

24  a psychiatric evaluation before that April 1st date

25  for Judge Zimmerman.  But that you can determine.

1           My first inclination was to order

2    one, so I contacted the judicial ethics to talk to

3    them about whether or not I have that power.  And

4    the determination was at this point it's

5    questionable whether if it's criminal I do have the

6    power; if it's civil, I don't.  So we wanted to err

7    on the side of caution and say it's civil at this

8    point unless it's determined by another judiciary,

9    and that's Judge Zimmerman's prerogative.

10           MR. HASTINGS:  And that's going to be in

11   Justice Court Department 3?

12           THE COURT:  Department 8, in this

13   department, April 1st.

14           MR. HASTINGS:  Okay.

15           THE COURT:  Mr. Vann, you are ordered to

16   be here.

17           Rabbi, you don't have to come unless

18   you want to be here.

19           MR. HASTINGS:  What time?

20           THE CLERK:  8:30.

21           THE COURT:  Do you want to put anything on

22   the record?

23           MR. DUBOWSKY:  Your Honor, thank you.  I

24   am Peter Dubowsky appearing just as amicus curiae

25   because Rabbi Wine and other victims are close

1   friends of mine and, of course, I am very disturbed

2   by this letter, these developments.  I have not been

3   present for the prior hearings, but I understand

4   that --

5           THE COURT:  I am not sure if I have a copy

6   of that.  It might be on my desk still.

7           MR. DUBOWSKY:  This, your Honor, is the

8   undated letter.  As you can see, your Honor, it's

9   nothing less than the rantings of a mad man and I

10  believe --

11          THE COURT:  You wrote this, didn't you,

12  Mr. Vann?

13          THE DEFENDANT:  I can't see it.

14          THE COURT:  Show him.

15          MR. HASTINGS:  Is there any way we can get

16  a copy of this?

17          THE COURT:  You're going to get a copy.  I

18  just wanted to know did you write that letter?  Is

19  that your signature?

20          MR. HASTINGS:  Judge, that's an admission

21  which you know probably isn't appropriate to make

22  without having been --

23          THE COURT:  All right.

24          MR. HASTINGS:  You know.

25          MR. SIEGEL:  Judge, I think Mr. Vann also

1   wanted to know the costs that were out laid, not by

2   him, by somebody else on his behalf.

3          THE COURT:  Costs were denied.

4                 Danny, you can have that.

5          MR. HASTINGS:  This is a copy?

6          THE COURT:  That's a copy.  You can have

7   that.  I have a copy of that.  I will put it in the

8   file.

9          MR. SIEGEL:  Judge, just for the record,

10  is there a particular basis?

11         THE COURT:  You no longer represent him.

12  Thank you.  You can go.

13         RABBI WINE:  Your Honor.

14         THE COURT:  If Mr. Hastings wishes to

15  renew any motions, he can review them and renew them

16  if they have any basis or any merit.

17         MR. HASTINGS:  I will get together with

18  Mr. Siegel in the next day or two and review what

19  has happened in the case with him and then I will be

20  in a position to make a recommendation to my team

21  chief Mr. Amundson as to who should be appointed and

22  what should happen on the case.

23         MR. SIEGEL:  I will talk to Mr. Hastings

24  on the break.

25         MR. HASTINGS:  And we will have an

1   attorney appointed within the next week or so, and

2   Mr. Vann can speak with the attorney that will be

3   appointed, and they can make preparations for this

4   hearing on April 1st.

5              THE COURT:  Thank you.

6              MR. HASTINGS:  All right.

7              RABBI WINE:  Your Honor.

8              THE COURT:  Yes, sir.

9              RABBI WINE:  Lorne Wine, Rabbi Lorne Wine.

10  Especially in light of this letter, Yaakov Vann has

11  shown that he does not abide by any authority of

12  this Court and that his actions really show that he

13  does not feel that there are consequences to his

14  actions.  This letter tried essentially to destroy

15  my life and destroy Michelle Halabe's life and it

16  was only because I have a reputation in the Jewish

17  Court.  I mean, this is a huge Jewish Court.  To the

18  best of my knowledge, there's only two of them west

19  of Chicago that deal with all issues of conversion

20  and rabbinic activity, which, of course, I need a

21  close relationship with them in order to fulfill my

22  duty to my congregants, to the Las Vegas community.

23             As much as he's shown that he has no

24  regard for the Court, for the protection order, or

25  that there is consequences for his actions, I am

1  very concerned.  I don't know what he'll do next.  I

2  see him --

3          THE COURT:  I understand.  And I have to

4  follow certain civil laws, and I'm trying to follow

5  them very carefully.  Peter can explain that to you.

6  I have to take certain steps before I can proceed.

7          I mean, the only way, as I understand

8  it, under rabbinical law, which I don't profess to

9  know real well, the only way he is going to abide by

10  rabbinical law is if he's humble enough to submit to

11  that and to follow whatever they recommend.  I've

12  seen enough of Mr. Vann to know he's not going to

13  listen to them.

14          I mean, that would probably satisfy

15  me if he would commit to going to that rabbinical

16  court and abiding by what their ruling was.  I would

17  rather have this in the rabbinical court and let

18  them handle it.  But I don't know that Mr. Vann is

19  of the mind-set to listen to them anyway.

20          MR. HASTINGS:  Judge, I am going to run in

21  the back hallway and make a copy of this letter so

22  that my client has -- or our client has a copy of

23  what's being said.

24          THE COURT:  Why don't you go ahead, you

25  can make one at your office.  I have to move on.

1   I've got other court matters to do.

2                MR. HASTINGS:  You have given us a court

3   date, so we are done.

4                THE COURT:  Okay.

5                MR. HASTINGS:  If you can just have a seat

6   for a minute, I am going to go make a copy of this

7   for you.

8                THE DEFENDANT:  Okay.

9                THE COURT:  My apologies that I can't

10  proceed today, but I have to follow certain laws.

11

12       (Whereupon the proceedings were concluded.)

13

14                    *   *   *   *   *

    Attest: Full, true, accurate transcript of proceedings.

15

16                    _Therese Ferriola_
                     THERESE FERRIOLA, CCR #314

17

18

19

20

21

22

23

24

25

1

1   TRAN
    CASE NO. TPO

FILED

2                     2003 APR 10 P 2: 08

3     IN THE JUSTICE'S COURT OF LAS VEGAS TOWNSHIP
                             LAS VEGAS, NEVADA

4       COUNTY OF CLARK, STATE OF NEVADA

5

6   RABBI LORNE WINE,         )
                          )        **ORIGINAL**

7           Plaintiff,    )

8        vs.               )   CASE NO. 02PO0996X

9   YAAKOV VANN,         )

10         Defendant.    )

11

12

13             REPORTER'S TRANSCRIPT

14                 OF

15              PROCEEDINGS

16      BEFORE THE HONORABLE DOUGLAS SMITH
           JUSTICE OF THE PEACE

17

18        WEDNESDAY, APRIL 2, 2003

19

20   APPEARANCES:

21

22    For the Defendant:        RALPH BAKER, ESQ.
                       Deputy Public Defender

23

24   Reported by: Therese Ferriola, CCR #314

25

```
 1        LAS VEGAS, NEVADA, APRIL 2, 2003, 9:00 A.M.

 2                      * * * * *

 3            THE COURT:  02PO-996, Yaakov Vann.

 4                No one's here.  Yaakov Vann.  Call

 5   the hall, please.

 6            THE BAILIFF:  Yes, sir.

 7                Nope.

 8            THE COURT:  Bench warrant, no bail.

 9        (Other matters on calendar heard.)

10            THE COURT:  Mr. Vann, you're late.  I

11   called the case.

12                Go get him, Thomas.

13                You're remanded to custody.

14                Somebody call the PD.  Where is Ralph

15   Baker?  There he is.

16                Mr. Baker, I've got cases going.

17   I've got this protective order.  This is 02P-996,

18   Yaakov Vann.  I have already called the case once.

19   He was not here.  I issued a no bail bench warrant.

20   He now shows up late when I'm about to start

21   in-custody preliminary hearings.  That is not

22   acceptable to the Court.

23                The public defender is appointed to

24   represent Mr. Vann, and we will have a hearing on

25   his revocation.  When do we have time for a hearing?
```

1        MR. BAKER:  Your Honor, could I make a

2   record?

3        THE COURT:  You can make a record.

4        MR. BAKER:  We would decline to accept the

5   appointment, if I may file our brief supporting

6   that, if I could just have a minute to sign it.  We

7   believe that the public defender was not created to

8   represent people in civil cases.  This is a civil

9   case.  May I file this with the Court?

10       THE COURT:  Sure.  This is not a civil

11  case, as I explained to you.  This is a pseudo

12  criminal case, because it's a protective order; and

13  as I told you, in reading the recent decision of

14  Alabama versus Shelton, which this was decided May

15  20th, 2002, a United States Supreme Court case, that

16  if it's contemplated that one is going to jail for a

17  criminal case, which this is pseudo criminal, then

18  he has the right to have an attorney.

19            He says he can't afford his own, and

20  he had one, and his attorney withdrew.  I don't know

21  why; he just withdrew.  And so to protect the

22  constitutional rights of this defendant, to follow

23  Alabama versus Shelton, I'm going to appoint the

24  public defender to represent him.  Can you be ready

25  on Friday?

1        MR. BAKER:  No, your Honor.  We have

2   nothing on the case.  We have not prepared.  We'd

3   like to do some discovery.  We would ask that you

4   set it for two weeks.

5        THE COURT:  He's going to be in custody

6   two weeks.

7        MR. BAKER:  And we'd ask he be released

8   from custody.

9        THE COURT:  No.

10       MR. BAKER:  I believe you put him in

11  custody, it hasn't even been five minutes after 9:00

12  o'clock.  This is on calendar for 9:00 o'clock.

13       THE COURT:  He was very disrespectful to

14  the Court.  He's been disruptive in court in the

15  past.  Today he hasn't said anything.  He went right

16  into custody.  I called the case.  It was continued

17  from yesterday.  He strolled in in his sunglasses

18  and stands in the back of the courtroom.  He was

19  remanded to custody because of his disruptive nature

20  in court and the fact he does not take this Court

21  seriously.

22            We will have a revocation hearing.

23  Now, it's up to you.  If you want your client to sit

24  two weeks, we will let him sit two weeks.

25       MR. BAKER:  We can't possibly be ready.

THERESE FERRIOLA
OFFICIAL COURT REPORTER
(702) 455-3048

```
 1   We have no discovery.  We don't know anything about
 2   the case.
 3              THE COURT:  All right.  We will have a
 4   status check on Friday morning.  Make sure you are
 5   ready.  And I'll probably put this on Monday or
 6   Tuesday for you to prepare, so you can be prepared.
 7   This man has the right to have a hearing.
 8              MR. BAKER:  Your Honor, I think Shelton
 9   versus Alabama did not criminalize civil TPO's.
10              THE COURT:  This isn't civil.  You keep
11   saying civil.
12              MR. BAKER:  This is civil.
13              THE COURT:  It's pseudo criminal.
14              MR. BAKER:  We need the Court's file.  We
15   don't have anything at all.  I gave everything to
16   Mr. Vann yesterday.
17              THE COURT:  Why did you do that when I
18   appointed you guys?
19              MR. BAKER:  We don't represent him, it's
20   our opinion we don't represent him.
21              THE COURT:  When the Court --
22              MR. BAKER:  According to Judge
23   Zimmerman --
24              THE COURT:  Well, Mr. Baker, you don't
25   have that choice to decide you don't represent him.
```

```
 1              MR. BAKER:  Your Honor, I believe we do
 2    have that choice.  I think as an executive decision
 3    we can say -- the executive branch can say what they
 4    want to appoint the public defender to work at.  And
 5    as you've read in the paper, we're already double
 6    the caseload.
 7              THE COURT:  Great.
 8              MR. BAKER:  We can't possibly be
 9    effective.
10              THE COURT:  What's your caseload like?
11              MR. BAKER:  My caseload?  I'm not even
12    supposed to have a caseload.
13              THE COURT:  Good.  Then you got this case.
14    You can do it.
15              MR. BAKER:  But we still need the file.
16              THE COURT:  See you on Friday, Friday
17    morning.  Make sure you get the discovery.
18              MR. BAKER:  Who am I supposed to get it
19    from, your Honor?
20              THE COURT:  Your client.
21              THE CLERK:  April 4th, 8:30.
22                      *  *  *  *  *
23    Attest: Full, true, accurate transcript of proceedings.
24
25                      THERESE FERRIOLA, CCR #314
```

THERESE FERRIOLA
OFFICIAL COURT REPORTER
(702) 455-3048

FILED

1     TRAN

                                    MAY 7  II 41 AM '03
2

3              IN THE JUSTICE COURT OF LAS VEGAS TOWNSHIP

4                   COUNTY OF CLARK, STATE OF NEVADA

5

6

7     RABBI LORNE WINE,                    ORIGINAL

                        Plaintiff,
8

9                                    CASE NO. 02P00996X

10    YAAKOV VANN

11                    Defendant.
      _____/
12

13

14

15                    REPORTER'S TRANSCRIPT
                             OF
16                        PROCEEDINGS

17          BEFORE THE HONORABLE DOUGLAS SMITH
                   JUSTICE OF THE PEACE
18
                     TUESDAY, MAY 6, 2003
19                        8:30 A.M.

20    APPEARANCES:

21      For the Plaintiff:      PETER DUBOWSKY, ESQ.

22

23      For the Defendant:      ROBERT MILLER, ESQ.
                                DEPUTY PUBLIC DEFENDER
24

25    Reported by: THERESE FERRIOLA, CCR #314

1               LAS VEGAS, NEVADA, MAY 6, 2003, 8:30 A.M.

2

3                             *  *  *  *  *

4

5               THE COURT:  02PO-996, Yaakov Vann.

6               MR. MILLER:  Your Honor, may the record

7    reflect the presence of Mr. Vann.  We would request

8    leave of the Court to file a supplemental memorandum

9    with points and authorities in open court.

10              THE COURT:  Okay.

11              MR. MILLER:  All right.  That's been

12   accomplished.  This was on today for our motion for

13   reconsideration of appointment of public defender's

14   office in this matter.

15              THE COURT:  Actually, I went back and read

16   the statute.  He is entitled to an attorney.  It

17   doesn't say the public defender.  So I'll relieve

18   the public defender of representation.

19                   Are you going to represent yourself,

20   Mr. Vann, since you went to law school?

21              THE DEFENDANT:  No, sir.

22              THE COURT:  So what are you going to do?

23              THE DEFENDANT:  I would ask the Court to

24   appoint an attorney, please.

25              THE COURT:  Do a financial affidavit.  Do

                          THERESE FERRIOLA
                      OFFICIAL COURT REPORTER
                          (702) 455-3048

```
 1    you have a financial affidavit?  Where is the
 2    financial affidavit?
 3                    Do we have a blue form?
 4              THE BAILIFF:  I have a blue form.
 5              THE COURT:  And you're going to swear
 6    these things are true.  We are going to do a
 7    background check.  And if you make a false
 8    accusation, you will go into custody.
 9              MR. MILLER:  Your Honor, may I approach
10    the bench?
11              THE COURT:  Yes.
12         (Discussion held off the record.)
13              THE COURT:  Okay.  I'm going to set this
14    for a hearing, so you can stay or you don't have to.
15    Why don't you just have a seat for a minute.  As
16    soon as he fills this out, I will have to figure out
17    who I'm going to appoint.
18              MR. DUBOWSKY:  Okay.
19         (other matters on calendar heard.)
20              THE COURT:  02PO-996, Yaakov Vaan.
21                    Mr. Vaan, I am going to have you come
22    back in two days, and I will have an attorney here
23    for you.  We're going to do a background check.  I'm
24    going to assign the district attorney's office to do
25    a background, financial background, check on you.
```

```
1    You tell me you don't have any money.  We will see.

2                   This matter is probably going to be

3    sent to Henderson to be tried in front of a

4    magistrate in Henderson, because I want to avoid any

5    impropriety.  And so I will be contacting Henderson

6    and notifying the chief judge out there, Rodney

7    Burr, of this.  But I will know in two days.  So you

8    be back here on Thursday.

9                   MR. DUBOWSKY:  Your Honor, did the chief

10   judge find that there was no conflict with your

11   hearing the matter?

12                  THE COURT:  There was no conflict.  But to

13   avoid a problem, I'm going to send it out there.

14                  MR. DUBOWSKY:  In two days, what will that

15   be on for?

16                  THE COURT:  That will be to appoint

17   Mr. Lally and send it to Henderson, and then in

18   Henderson they will set the trial, and then we will

19   have a date in Henderson.  I just think it's better

20   that we do it that way.

21                  MR. DUBOWSKY:  There's no evidentiary

22   hearing in two days?

23                  THE COURT:  No.  So the witnesses don't

24   have to be here.  They can, they have always been

25   here.  I just think to avoid a problem, I just don't
```

```
 1   know if I can be fair with Mr. Vann.  I want to put
 2   him in jail, and I don't think it's fair that I rule
 3   on it.  And that's all I'm going to say.  So I am
 4   going to recuse myself, but I'm going to send it to
 5   Henderson and have Henderson handle the hearing.
 6           RABBI WINE:  Your Honor, Yaakov continues
 7   to break the Court's order.
 8           THE COURT:  I know.  There is the 30-day
 9   that has been continued, and the record should note
10   that it is continued at my behest for the year.  And
11   Mr. Vann continues to violate it.  But that's going
12   to have to be another judge that hears it.
13               There's a statute that dictates I
14   can't be fair if I'm predisposed.  I'm not
15   predisposed.  I just don't know if I can be fair
16   with Mr. Vann because I think that he is playing
17   with the system.  I don't know that he is mentally
18   capable of making rational decisions.  I'm going to
19   suggest they do a psychiatric evaluation again of
20   Mr. Vann.  We did one.  I just don't think he's got
21   everything there.
22           MR. DUBOWSKY:  You have already conducted
23   the examination?
24           THE COURT:  Yes.  I thought we did.  I'm
25   going to make that suggestion to the judge out in
```

```
 1    Henderson.  Let them handle it out there.  I'm going
 2    to call Judge Burr today, and I will have a decision
 3    on who, but Emmett Lally will probably be the
 4    attorney.  Thank you.
 5                 Two days.  We will do a background
 6    investigation.
 7              THE CLERK:  May 8th, 8:30.
 8              THE DEFENDANT:  Your Honor, any chance it
 9    could be the 9:30 calendar, please?  I have to take
10    my kids to school.
11              THE COURT:  We don't have a 9:30 calendar,
12    but I will put it on at 9:30 for you.
13              THE DEFENDANT:  Thank you, sir.
14              THE COURT:  Yes.
15              MR. DUBOWSKY:  Your Honor, you can't
16    review or you are not inclined to for reasons of
17    putting him in jail, again, pursuant to your order,
18    and you can still order the psychiatric evaluation?
19              THE COURT:  I think so.
20              MR. DUBOWSKY:  You can do that pending the
21    hearing?
22              THE COURT:  I think so.  I don't know.  I
23    don't know what we can do with this.  I don't know
24    why he just doesn't leave everybody alone.  It would
25    be easy to just leave everybody alone.  And he just
```

```
 1   doesn't seem to want to do that.  I'm just trying to

 2   keep peace in the community.  That's all I'm trying

 3   to do.

 4           MR. DUBOWSKY:  I appreciate that,

 5   your Honor.

 6           RABBI WINE:  Thank you, your Honor.

 7           THE COURT:  Okay.

 8

 9                    *  *  *  *  *

10   Attest: Full, true, accurate transcript of proceedings.

11

12                           THERESE FERRIOLA, CCR #314

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

1  TRAN
   CASE NO. PROTECTIVE ORDER                    2003 MAY -9  A 8: 04
2

3      IN THE JUSTICE'S COURT OF LAS VEGAS TOWNSHIP

4          COUNTY OF CLARK, STATE OF NEVADA

5

6  RABBI LORNE WINE,              )        **ORIGINAL**
                                  )
7          Plaintiff,             )
                                  )
8      vs.                        )   CASE NO. 02PO0996X
                                  )
9  YAAKOV VANN,                   )
                                  ),
10         Defendant.             )
   ------------------------------

11

12

13              **REPORTER'S TRANSCRIPT**

14                     **OF**

15                **PROCEEDINGS**

16      **BEFORE THE HONORABLE DOUGLAS SMITH**
                **JUSTICE OF THE PEACE**
17
             THURSDAY, MAY 8, 2003
18

19  APPEARANCES:

20   For the Plaintiff:        PETER DUBOWSKY, ESQ.
      (Amicus curiae)
21

22   For the Defendant:        EMMETT LALLY, ESQ.

23

24  Reported by: Therese Ferriola, CCR #314

25

```
 1              LAS VEGAS, NEVADA, MAY 8, 2003, 9:30 A.M.
 2                          *  *  *  *  *
 3              THE COURT:  02PO-996, Yaakov Vann.
 4                    All right.  Before I appoint an
 5      attorney, Mr. Vann, we've started a background
 6      investigation on your financial position.  You have
 7      said some things in a statement.  I want you to
 8      raise your right hand, please.
 9
10                          YAAKOV VANN,
11              having affirmed to tell the truth
12              was examined and testified as follows:
13
14              THE COURT:  That's fine.  You indicate in
15      your blue statement, this is a photocopy that I
16      provided earlier to the district attorney's office,
17      that you are married.  What is your wife's name?
18              THE DEFENDANT:  Adena.
19              THE COURT:  And where were you married?
20              THE DEFENDANT:  New York.
21              THE COURT:  Okay.  And you have how many
22      children?
23              THE DEFENDANT:  Three and one due on June
24      10th.
25              THE COURT:  Now, there was an indication
```

```
 1    that you were moving to Florida.  Your wife had
 2    indicated that last time.  You're not moving to
 3    Florida; is that correct?
 4              THE DEFENDANT:  We'd like to move to
 5    Florida, but there's a problem with health insurance
 6    because she's got a preexisting condition of being
 7    pregnant, and she has insurance that she is paying
 8    for in Nevada.  So until we clear up that issue, I
 9    can't make a commitment to move prior to that time,
10    before.  After that time the intention is to move to
11    Florida, sir.
12              THE COURT:  You tell me you're unemployed,
13    that you have no business, that I took your business
14    away from you, that your wife doesn't work, yet you
15    live in Peccole Ranch.  And it looks to me like you
16    closed, do you remember what company you used to
17    close, because we are subpoenaing those records?
18              THE DEFENDANT:  I don't.  I don't know.  I
19    didn't --
20              THE COURT:  All right.  What's your bank
21    that you bank with?
22              THE DEFENDANT:  I have an account in -- I
23    think the name is Astoria.  I don't bank.  I have
24    like $50 in the account.
25              THE COURT:  So you have no bank that you
```

1    deal with in Las Vegas?

2            THE DEFENDANT:  Correct.

3            THE COURT:  How are you making your house

4    payments?

5            THE DEFENDANT:  My wife takes care of

6    finances.  And I know she just borrowed $15,000 from

7    her mother who took it out of her IRA to loan it to

8    her.

9            THE COURT:  Where did she put that 15,000?

10           THE DEFENDANT:  Don't know.

11           THE COURT:  All right.

12           MR. DUBOWSKY:  Your Honor, Peter Dubowsky

13   again appearing as a friend of the Court.  Maybe you

14   wish to ask Mr. Vann about the value of his home

15   that's up for sale.  I don't know.  I haven't seen

16   the paperwork that he submitted to the Court, but

17   you may want to ask him.

18           THE COURT:  He hasn't, or it's actually

19   Old Republic Title Company of Nevada.

20               You see, the reason we are going into

21   this extent is because you said you could not afford

22   your own lawyer.  You hired a lawyer.  You paid him.

23   And then there were difficulties.

24               How many square feet is your home?

25           THE DEFENDANT:  I believe about 3,000.

1          THE COURT:  In Peccole Ranch.  And the
2   value of that?
3          THE DEFENDANT:  Don't know.  It hasn't
4   sold, so I can't say.
5          THE COURT:  How much did you pay for it?
6          THE DEFENDANT:  I believe it was 265.
7          THE COURT:  And that's not in your name,
8   it is just in your wife's name; is that right?
9          THE DEFENDANT:  Correct.
10          THE COURT:  When was the last time you
11   worked besides the company you said that I took from
12   you?
13          THE DEFENDANT:  I worked -- I was
14   employed, I believe the dates are somewhere about
15   December 15th for about a month.  It was part-time.
16          THE COURT:  Where?
17          THE DEFENDANT:  The company was located in
18   Desert Shores.  It was driving a truck.
19          THE COURT:  And you have you passed the
20   bar here in Nevada?
21          THE DEFENDANT:  I haven't taken the bar,
22   sir.
23          THE COURT:  But you did go to law school?
24          THE DEFENDANT:  Correct.
25          THE COURT:  And you graduated from law

```
 1  school?
 2              THE DEFENDANT:  Same one as yours, sir.
 3              THE COURT:  And your father is an attorney
 4  in Manhattan?
 5              THE DEFENDANT:  Correct.
 6              THE COURT:  All right.  And you have no
 7  other property outside the state of Nevada?
 8              THE DEFENDANT:  Correct.
 9              THE COURT:  All right.  At this point we
10  will appoint Mr. Lally.  I've asked Mr. Lally to
11  represent you.
12              Mr. Lally, we are doing a financial
13  investigation.  If it turns out that any of the
14  statements are untrue, he may go into custody.  But
15  we're going to do and I'm going to order that the
16  district attorney's office continue the background
17  investigation into his finances, but we are
18  transferring this because of possible conflict to
19  Henderson.  I have talked to Judge Burr.
20              Do we have a date or did we even
21  contact him to find out what date?
22              (Discussion held off the record.)
23              THE COURT:  I know this is going to fall
24  on deaf ears, but I want you to stay away from these
25  people.  That is all I have asked through this whole
```

1 thing is leave the people of the synagogue alone.

2 They don't want you.  They want you to leave them

3 alone.

4            I mean, the information that I got

5 was you were going up and harassing them about being

6 at the synagogue.  And you were saying, oh, you went

7 to church, you went to church, you know, with the

8 communication that you don't recognize Rabbi Wine's

9 ordination.

10            Well, you know what?  Who made you in

11 charge of that?  There are other avenues.  Just

12 leave these people alone, please.  I mean, I can't

13 say it any more clearer than that.

14            If I didn't feel that I should put

15 you in jail right now, that's why I have to send it

16 to Judge Burr, because I feel like you don't care

17 about courts and you don't care about keeping peace.

18            And that's all I have tried to do in

19 this whole thing is keep peace, and you keep

20 disrupting it and violating the protective order.

21            So while you're away from this Court,

22 I will expect that you will abide by my order and

23 that is stay away from these people.  Do you

24 understand?

25            THE DEFENDANT:  Yes, sir.

```
 1            THE COURT:  All right.  We are trying to
 2   get a time, Mr. Lally, right now.
 3            MR. LALLY:  Do I correctly infer,
 4   your Honor, that you're transferring this because
 5   it's a contempt of court?
 6            THE COURT:  It is contempt of court and
 7   it's going to go to Henderson --
 8            MR. LALLY:  Okay.
 9            THE COURT:  -- for the decision.
10            MR. LALLY:  Judge.
11            THE COURT:  Hold on a second.
12            MR. LALLY:  Oh, yes, sir.
13            THE COURT:  May 14$^{th}$ we will set a hearing
14   at 10:00 o'clock in Judge Burr's department.  It
15   will either be Judge Burr or Judge George.
16            MR. LALLY:  May 14?
17            THE COURT:  Yes, sir.
18            MR. LALLY:  At 10:00 a.m.?
19            THE COURT:  Yes, sir.
20            MR. LALLY:  Okay.  Judge, Mr. Vann just
21   asked me if there was any sort of a complaint or
22   anything indicating what the nature of the charge is
23   or what --
24            THE COURT:  Violating my protective order.
25            MR. LALLY:  Okay.  Is there anything in
```

1   writing, your Honor?

2           THE COURT:  Nope.  Violating my order.

3   There will be testimony taken, not on the 14th.

4   They will set the hearing on the 14th.

5           MR. LALLY:  Okay.  The 14th again at what

6   time, please?

7           THE COURT:  10:00 o'clock.

8           MR. LALLY:  10:00 a.m.

9           THE COURT:  And get all the witness

10  statements together.  We will provide, if you make a

11  list and then we will provide a list to them, and

12  Judge Burr can handle that.

13          MR. DUBOWSKY:  Your Honor, a few questions

14  for clarification:  Are all the cases being

15  transferred to the Henderson Justice Court?

16          THE COURT:  The only one is O2PO-996, I

17  believe.

18          MR. DUBOWSKY:  Is the will of the Court to

19  have Henderson get a copy of all the transcripts?

20          THE COURT:  Yes.

21          MR. DUBOWSKY:  Those are part of the

22  official record?

23          THE COURT:  Including this transcript.

24          MR. LALLY:  Do you need an order from me

25  appointing me?

THERESE  FERRIOLA
OFFICIAL  COURT  REPORTER
(702)  455-3048

```
 1              THE COURT:  Nope.

 2              MR. LALLY:  Okay.

 3              THE COURT:  You are appointed.  You can

 4    start billing the County.

 5              MR. LALLY:  One more time, I don't mean to

 6    overreach, is there specific time and date on which

 7    he was held in contempt or committed contempt or was

 8    it ongoing?

 9              THE COURT:  It's been an ongoing one.  But

10    that's what the hearing will be for.  Judge Burr

11    will decide whether he's violated it, whether he

12    should go to jail.

13              MR. LALLY:  Okay.  Is there any discovery

14    that's available?

15              THE COURT:  Yes.  And he's got it.

16              MR. LALLY:  You have the discovery?

17              THE DEFENDANT:  I don't have any

18    discovery.

19              MR. LALLY:  He says he doesn't have it.

20              THE COURT:  Call Chip Siegel and see if

21    Chip has any more and the public defender Bob

22    Miller.  So two people, Chip Siegel, represented him

23    previously, and Bob Miller from the public

24    defender's office.

25              MR. LALLY:  Chip and Bob Miller.
```

1         THE COURT:  Okay.

2         MR. LALLY:  All right.

3         MR. DUBOWSKY:  Your Honor, one quick

4  question:  The violation of the order under the

5  statute is a crime, a gross misdemeanor.

6         THE COURT:  No.  They haven't filed a

7  complaint.  If I were the sergeant, who she was here

8  once before, I would have filed a complaint.  But

9  that's up to the Metro officers out there.  Every

10  time he breaks that order, she should have filed a

11  complaint.  But she hasn't done so.  And I even

12  instructed her to consider it.

13         MR. DUBOWSKY:  I'm not sure she

14  understands the procedures.

15         THE COURT:  Oh, yes, a sergeant knows the

16  procedures.

17         MR. DUBOWSKY:  Okay.

18         THE COURT:  Thank you.

19         MR. DUBOWSKY:  Thank you, your Honor.

20  Your Honor, may I approach on an unrelated matter?

21         THE COURT:  Yes, please.

22         MR. LALLY:  Your name, sir?  What is your

23  name?

24         MR. DUBOWSKY:  Here you go.

25         THE COURT:  He just comes in as a friend

1  of the Court.

2          MR. LALLY:  He's a friend of the Court but

3  is he the attorney of record, Judge?

4          THE COURT:  He is a friend of the Court on

5  behalf of the victim, of the plaintiff in the

6  protective order, Rabbi Wine and others, et al.  So

7  he isn't going to be prosecuting it.  He just

8  appears in court because they are interested.

9          MR. LALLY:  Okay.  Am I dealing with the

10  State?

11          THE COURT:  You are dealing with the

12  Court.

13          MR. LALLY:  Just the Court?

14          THE COURT:  Just the Court.  Thank you.

15          THE DEFENDANT:  May I get an address of

16  the court in Henderson, please?

17          MR. LALLY:  I will tell you.

18          THE COURT:  Your attorney will take care

19  of it.

20          MR. LALLY:  I'll tell him.  Thanks, Judge.

21          THE COURT:  Thanks, Mr. Lally.

22                    *  *  *  *  *

23  Attest: Full, true, accurate transcript of proceedings.

24                    _THERESE FERRIOLA, CCR #314_

25

THERESE FERRIOLA
OFFICIAL COURT REPORTER
(702) 455-3048